535 So.2d 1119 (1988)
Robert Lee WOOLSEY, Sr., Plaintiff-Appellant,
v.
COTTON BROTHERS BAKERY CO., INC. & Liberty Mutual Insurance Co., Defendants-Appellees.
No. 19930-CA.
Court of Appeal of Louisiana, Second Circuit.
November 30, 1988.
Writ Denied February 17, 1989.
*1121 Bruscato, Loomis & Street by C. Daniel Street, Monroe, for plaintiff-appellant.
Theus, Grisham, Davis & Leigh by James M. Edwards, Monroe, for defendants-appellees.
Before HALL, C.J., and MARVIN, SEXTON, NORRIS and LINDSAY, JJ.
MARVIN, Judge.
In this appeal of a judgment rejecting the employee's worker's compensation demands, two of the three judges of the original appellate panel proposed to reverse the judgment. A dissent by the third provoked a reargument before a five-judge appellate panel as required by LSA-Const. Art. 5, § 8B.
The employee sustained a heart-related disability which was diagnosed after he experienced disabling pain or angina while working and had a mild heart attack in the hospital two days later.
The trial court found insufficient proof of a causal link between plaintiff's work and the heart disease that produced the disability. On reargument, and although we adopt the trial court's factual findings, *1122 we reverse the judgment because those facts are legally sufficient to prove the causal connection under the controlling law. Guillory v. U.S. Fidelity & Guar. Ins. Co., 420 So.2d 119 (La.1982); Guidry v. Sline Indus. Painters, Inc., 418 So.2d 626 (La.1982).

FACTS
We adopt the trial court's facts:
Plaintiff worked for many years as a route salesman for Cotton. He had designated retail outlets which he served by delivery of bakery products, stocking shelves and arranging displays in the stores. The "average" day required him to begin loading his truck around 5:00 a.m. by transferring the previously arranged stacks or racks already at the loading dock to his truck. This activity involved lifting some containers and moving racks. He was expected to meet a general time schedule in arriving at and servicing the several retail outlets. He usually completed his route shortly after lunch, but there were at least two outlets at which he was obliged to make return trips [during] one or two days a week. On those occasions, he usually had a break of several hours in the afternoon before returning, usually around 6:00 to 8:00 p.m. He was off on Wednesdays and Sundays.
Plaintiff was described by his wife, supervisors and fellow employees as a very conscientious person, but "tense" or "high strung" and rather easily agitated. His doctor said he was an "extremely anxious" person. In the spring of 1986, he had several weak, dizzy spells at home during which he nearly passed out. Medical examinations including stress tests, electrocardiogram and others for heart trouble were apparently negative, but his blood pressure was found to be high to ... "moderately severe" ... He was placed on a mild tranquilizer and [blood] pressure control medication.
Corroborated by his wife, he said that he felt fatigued and somewhat listless most of the time and asked his supervisors to reduce his work load, which was done for a time. However, his supervisor testified that because plaintiff's income was falling off, he later added some outlets back to his route.
On Saturday, November 22, 1986, while on a break from work, plaintiff began having chest pains.1 He had such symptoms "off and on" throughout the weekend, and did not feel well when he reported to work on Monday, November 24. During the time he was loading his truck, plaintiff was observed by a fellow employee leaning against an object, sweating and complaining of chest pain. The other person went after the supervisor, who suggested that plaintiff go to his doctor. When that suggestion was rebuffed, the supervisor left to find someone to assist plaintiff in loading the truck and making the route; but when he returned, plaintiff had gone with his truck.
On the supervisor's instructions, the other employee later caught up with plaintiff and assisted him for several hours. At about 10:30 a.m., plaintiff stated he could not continue and was taken to the office of his doctor nearby. After a brief discussion, the doctor sent plaintiff to the emergency room at Glenwood Hospital.
There, EKG and enzyme and other diagnostic procedures revealed no evidence of heart involvement, though blood pressure was elevated. After other activities were unremarkable, Dr. Hammett surmised that the trouble might be gastric and called in another specialist. On November 26, during a procedure which involved the introduction of a tube and light into the stomach through the esophagus, plaintiff began to complain of chest pains, even though he was somewhat sedated. The gastric examination was negative, but because of continued chest pain, plaintiff was again checked by EKG and other procedures.
This time, the doctors noted evidence on the EKG of possible heart problems and Dr. Hammett called in Dr. Koepke, a cardiologist. That specialist did a catheterization, which revealed four heart arteries with substantial blockage (95% in *1123 the right coronary artery) and a small area in the heart muscle itself where damage had occurred. The doctors opined that in all probability, plaintiff had suffered a slight myocardial infarction during or shortly after the gastroscopy. Dr. Koepke advised bypass surgery.
After a brief recovery period at Glenwood and at home, without remarkable difficulty, plaintiff decided to undergo the surgery, which was scheduled for December 17. On December 15, however, plaintiff became quite anxious about the surgery and began to experience chest pain. He was hospitalized as a precaution, but all tests were negative for additional heart involvement. He underwent a triple bypass procedure and ultimately was pronounced generally recovered from that surgery by the end of April.
His doctors have advised him to avoid heavy lifting and as much stress as possible and have therefore declared him disabled from any work other than "sedentary." He contends that he has been unable to find such employment and argues that his heart attack and disability were caused or substantially contributed to by the physical exertion, long hours and stress of his work, culminating in his "accident" on November 24.
1. Plaintiff testified that he had eaten some chili and that he believed the discomfort was in his digestive tract, distinguishing the pain from that suffered on November 24. However, his reports to his doctors, and their description of his symptoms, do not so clearly differentiate.

MEDICAL TESTIMONY
Dr. Hammett, who treats heart disease in his internal medicine practice, and Dr. Koepke, a cardiologist, testified by deposition. The doctors who performed the gastroscopy and the bypass surgery were not called.
Heart-related chest pain, or angina, occurs when a coronary artery is partially blocked, usually by the accumulation of plaque in the arterial walls (atherosclerosis). The pain is a sign that heart tissue in the area of the blockage is not receiving enough oxygen. Angina usually occurs during strenuous activity, when the heart's need for oxygen increases, and subsides when the activity stops, allowing the heart's decreased oxygen demands to be satisfied in spite of the partial blockage. Angina is a symptom of heart disease but does not cause permanent damage to heart tissue.
Permanent damage, or a heart attack, occurs when the narrowed artery becomes totally blocked, usually by a blood clot. The heart tissue beyond the obstruction dies from lack of oxygen. A heart attack is medically discernible in EKG and heart enzyme tests. If the patient has chest pain but has not yet had a heart attack, these tests will not identify the pain as heart-related. At this juncture, according to Dr. Koepke, it can be hard to distinguish angina from gastric pain.
A person's chances of developing heart disease are increased by high blood pressure, high cholesterol level, smoking, and a family history of heart disease. Plaintiff had been recently diagnosed as having high blood pressure. He had smoked a pack of cigarettes a day for many years. His father and two brothers had heart disease.
Dr. Hammett first saw plaintiff in March 1986, when his high blood pressure was diagnosed after dizzy spells at home. Plaintiff then had no chest pains and Dr. Hammett found no evidence of heart disease from the results of EKG and treadmill tests. Dr. Hammett opined, with benefit of hindsight, that plaintiff probably had heart disease in March 1986. He explained that the blood pressure medicine plaintiff was on when he took the treadmill test in March lowers the heart rate and could have hidden signs of heart disease. Plaintiff was apparently still taking the same or similar medication when he had another normal EKG on November 24, after he left work with chest pain.
Plaintiff said his pain on the 24th was in the center of his chest and down the side of his neck and was accompanied by a burning sensation. According to Dr. Hammett, plaintiff described the pain as a "burning raw sensation" which began about three days before, after he ate some chili. Dr. *1124 Hammett recalled plaintiff saying it felt like "something was rolling up into his chest from his abdomen."
Dr. Hammett initially thought the pain was heart-related, but the EKG and other cardiac tests did not confirm his suspicion. In light of these results, and plaintiff's description of the pain as moving from his abdomen into his chest, Dr. Hammett consulted with a gastrologist to determine the source of the pain. After plaintiff had increased chest pain and significant EKG changes during or shortly following the gastroscopy, Dr. Hammett suspected plaintiff was having a heart attack and called in Dr. Koepke. Plaintiff was given infusions of streptokinase, an enzyme which dissolves blood clots, and heparin, a blood thinner which prevents new clots from forming. These infusions relieved the chest pain and apparently opened up the artery that was blocked, minimizing the amount of heart tissue destroyed by lack of oxygen during the heart attack.
Dr. Koepke's heart catheterization a few days later showed 95 percent blockage in the right coronary artery, the artery associated with the heart attack. Blockage in the other coronary arteries ranged from 50 to 80 percent.
Although Dr. Hammett did not know what was causing the chest pain when he hospitalized plaintiff for evaluation on November 24, he and Dr. Koepke agreed in retrospect that the chest pains plaintiff had at work on the 24th were probably heart-related rather than gastric in origin. Their opinion was based on the occurrence of the heart attack on the 26th, the negative gastroscopy results, and the severe degree of arterial blockage shown by the heart catheterization. They opined that plaintiff had episodes of angina, but not a heart attack, when he had intermittent chest pain from November 22 until the heart attack on November 26.
Drs. Hammett and Koepke agreed that someone with plaintiff's risk factors and severe degree of blockage could have had a heart attack at any time, whether at work or at home. Dr. Hammett said if plaintiff's heart condition had been discovered before November 24, 1986, he would not have let him go back to work which involved heavy physical labor and because the pace and time constraints of work were stressful to plaintiff. Dr. Koepke was more equivocal on this point, saying the relationship between the risk of a heart attack and either or both strenuous physical activity and severe emotional stress is not totally understood. Had he known of plaintiff's condition before November 24, Dr. Koepke would have recommended bypass surgery. He deferred to Dr. Hammett when asked what restrictions plaintiff should have on his activities.
Plaintiff was 52 years old when he had bypass surgery in December 1986. Dr. Hammett still sees him once every 4-8 weeks and expects plaintiff will require medical management for the rest of his life. Even though he has had bypass surgery, plaintiff still has high blood pressure and some atherosclerosis. He takes medicine to control his blood pressure and thin his blood. He occasionally takes a mild tranquilizer and has taken pain medicine to relieve pain associated with his incision. Dr. Hammett said bypass grafts of blood vessels usually have to be redone after about ten years.
Dr. Hammett considers plaintiff disabled from performing heavy physical labor, as he did for the bakery for 21 years, because he is still at risk for a heart attack and activities like lifting, bending and stooping would place increased demands on his diseased heart. Dr. Hammett is concerned that plaintiff's low threshold for tolerating stress suggests that plaintiff should not return to stressful work. Dr. Hammett described plaintiff as "extremely anxious" and said that he "just can't handle stress at all." Dr. Hammett opined that plaintiff should only do sedentary work in a low-stress setting.
Plaintiff said the bakery's personnel director "turned down" his request for sedentary work after May 1987. The personnel director did not testify. Plaintiff has not been able to find a job because of his medical restrictions and has not worked since November 24, 1986.
*1125 The bakery's group medical insurer has paid some of plaintiff's medical bills. The bakery's worker's compensation insurer has not paid any medical expenses or weekly benefits and has persistently maintained that plaintiff's disability was not work-related.

TRIAL COURT CONCLUSIONS
The trial court found plaintiff failed to prove more probably than not that he suffered any work-related "heart accident" or that any such "accident" caused his disability. The court noted there was little or no disability resulting from the mild heart attack on November 26 and that the disability and risk of future heart attacks result from the deteriorated condition of plaintiff's arteries, the bypass surgery, and the probability of recurring blockage.
The court recognized that physical exertion and possibly emotional stress will increase the heart's oxygen demands, which may not be adequately met by the restricted blood flow through the partially blocked arteries. The court further noted that physical exertion may be a factor in causing a clot or solid material to move and occlude an artery, provoking a sudden heart attack. Notwithstanding this evidence, the court emphasized that the diseased condition of the arteries is caused by factors such as heredity and smoking, and is not caused or contributed to by physical exertion and stress.
The pivotal issue is not whether plaintiff's physical exertion or stress at work contributed to the deteriorated condition of his arteries, but is best stated as whether the exertion and stress at work contributed, in a degree greater than the exertion and stress of everyday, nonemployment life, to the disabling pain or angina that plaintiff experienced at work on November 24. This is the proper analysis for deciding compensation claims of workers with pre-existing heart disease who suffer a heart-related accident while at work. Guidry, supra.

ANGINA AS "ACCIDENT"
Episodes of angina suffered by an employee at work have been recognized as "accidents" for which compensation may be awarded, even if the angina is not followed by a heart attack. See Adams v. New Orleans Public Service, Inc., 418 So.2d 485 (La.1982); and Allison v. State Farm Fire & Cas., 520 So.2d 1063 (La.App. 3d Cir. 1987).
The "accident" in this case was the disabling pain or angina that plaintiff suffered while working on November 24, not the heart attack he had in the hospital two days later. The trial court's emphasis on the fact that he had little or no disability from the heart attack itself is misplaced. Damage to the heart was fortunately minimized by prompt medical intervention. With or without the heart attack, and regardless of whether it was provoked by the gastroscopy, plaintiff would be unable to return to his former work because of his underlying heart disease. The disease first manifested itself by angina rather than by a heart attack, obviously because plaintiff's arteries were not totally blocked before November 26.
Even if the chest pain he had on Saturday, November 22 was angina and not "heartburn" from eating spicy food, as he testified, plaintiff said the pain began when he went back to work after his lunch break. Saturday was a regular workday. Either the Saturday (11/22/86) or the Monday (11/24/86) episode of angina is legally classified as an on-the-job "accident." We focus on the November 24 episode because there is more detailed evidence of his condition on that day than on November 22.
In Dortch v. Louisiana Central Lumber Co., 30 So.2d 792 (La.App. 2d Cir.1947), the plaintiff experienced pain in his right shoulder while using a saw at work. He worked in pain for another hour but did not complain to his co-workers. The pain kept him from working for the next two days. On the morning of the third day, the pain suddenly intensified as he was stooping to tie his shoe at home. He was hospitalized and found to have a collapsed lung. This court rejected the employer's contention that the "accident" was not compensable because it occurred when plaintiff was at *1126 home tying his shoe and not when he was at work several days earlier. The fact that the "physical breakdown or consummation of the accident" occurred gradually rather than instantaneously, and while plaintiff was at home several days after he first felt pain associated with the condition while working, did not obviate the employer's obligation to pay compensation for the resulting disability. 30 So.2d at 797.

PRE-EXISTING HEART DISEASE
Several cases have noted the difficulty of proving work-related causation in cardio-vascular accidents suffered by employees who have pre-existing heart disease and who could eventually be disabled by their condition regardless of work activity. Guidry, supra, 418 So.2d at 632. The causal link is established by proof that the employee's work activities, acting upon his pre-existing heart disease, entail greater exertion, stress or strain than everyday nonemployment activities. Guidry, at p. 633.
The comparison is between the employee's work activities and the everyday activities of someone who does not work. We do not compare the employee's activities on the day in question with his usual work activities (see Guidry, supra, fn. 15, 418 So.2d at 633), or the work activities of a plaintiff with the activities of other employees doing comparable work. The trial court alluded to these legally insignificant comparisons in questions asked of a defense witness.
The fact that the deteriorated condition of the employee's arteries is primarily due to personal attributes unrelated to his employment, such as a smoking habit, high blood pressure, or a family history of heart disease, does not defeat a compensation claim if the employee proves, legally and medically, that his work activities contributed to the disabling condition, here angina. Guidry, supra, fn. 15, 418 So.2d at 633; Walker v. Austin Power Co., 467 So.2d 1246 (La.App. 2d Cir.1985), writ denied.
Guidry reiterates prior case law that recognizes that the work activities need not be the sole cause of the heart accident and that the inevitability of the accident, whether at work or elsewhere, is legally insignificant, if, in fact, the accident occurs on the job. 418 So.2d at 631, fn. 9, citing Roussel v. Colonial Sugars Company, 318 So.2d 37 (La.1975).

CAUSAL LINK
Plaintiff's initial responsibility each morning was to load his truck with merchandise stacked by others on trays behind his truck on the loading dock. Each tray weighed about 15 pounds. Fifteen trays were stacked on the loading dock, but the height of plaintiff's truck would accommodate only ten trays. Plaintiff had to remove the excess trays from the basket-type racks on the dock and load the racks, weighing up to 150 pounds each, onto his truck by using either a two-wheel dolly or a "pull rack." His truck held 10 or 12 racks of merchandise.
Racks and trays would be broken down similarly at each delivery point. Plaintiff often had orders for more than his truck could hold and would have to return and reload to complete orders after delivery of his first load.
Plaintiff's activities entailed heavy lifting, bending and stooping. Dr. Hammett restricted plaintiff from these activities after his heart disease was diagnosed because this restriction would reduce one factor that placed plaintiff at risk of another heart attack. It is logical to infer from this testimony that the described activities were among the risk factors he faced before his heart disease was positively diagnosed during his November hospitalization. The pattern of his chest pains at work before that hospitalization corresponded to the medical testimony that angina usually occurs when physical exertion, and the heart's demand for oxygen, increases, and usually subsides when the exertion and oxygen demand decreases.
Applying the law in Guidry and other authorities cited to the facts found by the trial court, we must respectfully disagree *1127 with the trial court's finding that plaintiff failed to prove more probably than not that he suffered any work-related "heart accident" or that any such "accident" caused his disability.
Because the evidence clearly shows that plaintiff's physical exertion at work was greater than that of a nonworker, we do not reach the more difficult problem that concerned the doctors of the extent to which low tolerance for stress may have contributed to plaintiff's condition.

BENEFITS
Plaintiff was totally disabled for 22 weeks. The litigants stipulated his rate of compensation to be $261 per week. He is entitled to $5,742 in temporary total disability benefits.
On April 27, 1987, plaintiff's doctor released him to return to sedentary work. Plaintiff testified he has not been able to find work with the bakery or elsewhere because of his permanent medical restrictions. He has shown that he is unable to earn 90 percent or more of the wages he was earning when he was injured. The bakery has not borne its burden of proving that sedentary work was offered or is locally available to him. See and compare Gaspard v. St. Paul Fire & Marine Ins. Co., 483 So.2d 1037 (La.App. 3d Cir.1985); Valley v. American Ins. Co., 510 So.2d 449 (La.App. 3d Cir.1987), writ denied; and Henderson v. Jackson Iron & Metal Co., 535 So.2d 983 (La.App. 2d Cir.1988).
Plaintiff is entitled to supplemental earnings benefits for the duration of his disability, subject to the statutory limitations on recovery. LRS 23:1221(3). The statute allows recovery of supplemental earnings benefits for no more than 520 weeks but gives conditions under which they may be terminated sooner. Not knowing when or if these conditions will arise, we cannot award benefits for 520 weeks, as plaintiff asks.
The bakery contends plaintiff cannot recover more than 520 weeks of benefits, whether for temporary total disability or supplemental earnings, and asks for credit equal to the temporary total disability payments if it pays plaintiff 520 weeks of supplemental earnings benefits. We do not consider the merits of this argument. We cannot speculate how many weeks of supplemental earnings benefits plaintiff will ultimately collect. Any ruling on the claim for credit would be premature at this juncture.
Plaintiff seeks $43,903.63 in medical expenses under § 1203. The bakery does not contend any of plaintiff's treatment was unnecessary, but asks for credit for $14,411.97 of these expenses that were paid by Southwest Life Insurance Co., the group medical insurer of the bakery employees. The premiums for this coverage were paid entirely by the bakery. We do not agree with the bakery's position that its payment of all premiums distinguishes this case from Bryant v. New Orleans Public Service, Inc., 414 So.2d 322 (La. 1982), where a similar request for credit was denied.
The court in Bryant expressly declined to say whether the collateral source rule was applicable and instead based its decision on LRS 23:1163, which prohibits direct or indirect payment by an employee toward the cost of worker's compensation benefits. The court found that offsets for medical expenses paid by the claimant's husband's group health insurer, "in consideration for either her husband's payment of premiums or as his earned employee fringe benefit," would amount to indirect payment by the employee toward the cost of worker's compensation coverage, proscribed by § 1163. 414 So.2d at 323. Our emphasis.
Plaintiff's insurance coverage under the group medical plan was clearly a fringe benefit that he earned by working for the bakery, even though he may not have paid directly any portion of the premiums.
Bryant was followed in Theriot v. American Employees Ins. Co., 482 So.2d 648 (La.App. 3d Cir.1986). A contrary and anomalous result was thereafter reached in Fontenot v. Schlumberger Well Service, 503 So.2d 1109 (La.App. 3d Cir.1987). The trial court denied the employer and the compensation insurer credit for medical expenses *1128 paid by another insurer under a group health plan. The Third Circuit reversed and remanded for evidence of the amount already paid, without mentioning § 1163, Bryant, or its prior decision in Theriot. Bryant controls. Fontenot does not. For the reasons explained in Bryant, we deny the bakery's claim for credit.
We shall award plaintiff the medical expenses which total $43,903.63.
Defendants do not dispute that plaintiff spent $1,247.34 to obtain depositions and hospital records. This amount shall be taxed as costs.

PENALTIES; ATTORNEY FEES
The bakery's w.c. insurer, Liberty Mutual, has denied benefits. Its adjuster, Donna Yates, did not take statements from plaintiff or others but reviewed copies of handwritten statements of plaintiff's co-workers who heard him complain of chest pain on November 24. Ms. Yates obtained a description of plaintiff's job duties from the bakery's plant manager and verification of his wages from the personnel director. It is clear from these documents and from Ms. Yates's testimony that the employer and its insurer unwisely ignored or failed to investigate whether the angina occurred at work and took the position that plaintiff's disability was not work-related because his heart attack occurred in the hospital.
Ms. Yates obtained copies of plaintiff's hospital records for November-December 1986, but did not obtain medical reports of plaintiff's condition before or after those hospitalizations. She was aware that plaintiff told Dr. Hammett his chest pains began on Saturday, November 22, after he ate some chili, and that plaintiff complained of pain and told his supervisor on Monday that he "had had pain off and on since Saturday." The bakery's personnel director, Dave Powell, gave this reaction to these facts in his correspondence with Ms. Yates:
It is our position that if Mr. Woolsey's chest pains had been severe enough while he was at home, he would have gone directly to his doctor. Would he, under these circumstances, consider his illness to be job-related? His chest pains started on Saturday continuing through Sunday. Sunday is Mr. Woolsey's day off work. He did not go to the hospital on that day but waited until he reported to work on Monday.
Mr. Powell knew that Saturday was a workday for plaintiff. Ms. Yates said she did not know whether or not she requested any medical opinion about the connection between plaintiff's work and his heart attack or his angina, and admitted she had no medical opinion in her file. While the doctors themselves were initially unsure what was causing plaintiff's chest pain, the medical evidence that it was heart-related or angina was undisputed when plaintiff was discharged from the hospital on December 4, ten days after his November 24 episode of angina at work.
Based only on this limited investigation of the possible connection between plaintiff's work and his disability, Liberty Mutual denied benefits before OWCA made its recommendation and opinion. OWCA recommendations are statutorily weighed as "advisory only ... [without] any presumption of correctness as to the facts or the law." LRS 23:1310.1.
The statute directs us to assess a 12 percent penalty for nonpayment unless we find that the employer or its insurer "reasonably controverted" plaintiff's claim for benefits. § 1201(E). A claim is reasonably controverted if the employer or insurer had sufficient factual and medical information to reasonably counter the factual and medical information presented by the claimant. Chelette v. American Guar. & Liability Ins., 480 So.2d 363 (La.App. 3d Cir.1985).
The bakery and its insurer had ample factual information to warrant investigation and medical inquiry whether plaintiff's work contributed to his disability. This record shows defendants made no inquiry of, and did not seek medical reports from, plaintiff's doctors.
Adams and Guidry, cited supra, decided several years before plaintiff's claim arose, *1129 clearly set standards for evaluating and analyzing claims of employees with pre-existing heart disease who experience angina, without a heart attack, while working.
With incomplete medical information, the bakery and its insurer relied on their concurring "lay" conclusion that benefits were not due because plaintiff's heart attack did not occur at work. Even though plaintiff's heart attack did not occur at work, the disabling angina did. On this record, we cannot say defendants reasonably controverted plaintiff's claim with sufficient factual and medical information.
We assess penalties under § 1201(E). See and compare Duplechain v. Gulf States Utility Co., 468 So.2d 1386 (La.App. 3d Cir.1985), and Washington v. Southern Baptist Hosp., 506 So.2d 144 (La.App. 4th Cir.1987).
The claimant is entitled to attorney fees if the failure to pay benefits is found to be arbitrary, capricious, or without probable cause. § 1201.2. Attorney fees have been awarded where little or no attempt is made to investigate a w.c. claim and an attitude of indifference toward the employee has been exhibited. Alexander v. Department of Culture, 410 So.2d 1286 (La. App. 3d Cir.1982); Washington v. Southern Baptist Hosp., supra. Compare factually Green v. Jackson Rapid Delivery Service, 506 So.2d 1345 (La.App. 2d Cir.1987). We shall award attorney fees.
Here, as in Guillory, supra, defendants denied w.c. benefits "on the contention that there was no causal connection between the accident ... and the ensuing disability. The Bertrand [v. Coal Operators Casualty Company, 253 La. 1115, 221 So.2d 816 (1969)] decision was rendered in 1969 and has been the prevailing law since then. Notwithstanding the rebuttable nature of the Bertrand presumption, the tenor of the strong facts and evidence of causality in this case make the ... refusal to pay compensation arbitrary and capricious." 420 So.2d at 125.
The trial of this case took one day. Depositions of the two doctors were taken on August 4 and 12, 1987. The case was briefed in the trial court and appealed and briefed here. Considering this record and these circumstances, we determine that $6,000 is a reasonable fee. See and compare Chelette v. American Guar. & Liability Ins., supra.

DECREE
The trial court's judgment is reversed and judgment is hereby rendered in favor of plaintiff and against the defendant employer and its insurer
For $5,742 temporary total disability benefits;
For $43,903.63 past medical and related expenses;
For supplemental earnings benefits as provided by LRS 23:1221(3) and medical benefits as provided by LRS 23:1203, together with a 12 percent penalty on all past due benefits owed to plaintiff and legal interest on each past due benefit from its respective due date.
Plaintiff is further awarded $6,000 reasonable attorney fees. All costs, here and below, including $1,247.34 as the cost of obtaining depositions and hospital records, are assessed against defendants-appellees.
REVERSED AND RENDERED.
SEXTON, J., concurs in part and dissents in part with written reasons.
HALL, C.J., concurs in part and dissents in part for the reasons assigned by SEXTON, J.
SEXTON, Judge, concurring in part and dissenting in part.
I agree with the majority that plaintiff is entitled to worker's compensation benefits. However, I disagree that the plaintiff is entitled to penalties and attorney's fees.
As I appreciate the facts of this case, the plaintiff first sought medical treatment on November 24 and again on November 26. The doctors originally suspected heart involvement. However, because both an EKG and an enzyme test were negative they concluded that the more likely culprit was stomach difficulty. (As I appreciate it, a negative enzyme test definitively rules out a heart attack.) As a result, the plaintiff *1130 was given a gastroscopy examination involving the insertion of a lighted tube down the throat into the stomach. It was during this procedure that the heart attack occurred.
These facts, plus the fact that the plaintiff initially related his distress to a "bowl of chili," consumed a few days before the 24th were known to the insurer. The only reports available to the insurer were the voluminous hospital records consisting mostly of EKG records. There are only a few pages of doctors reports in the hospital records and they shed no further light on plaintiff's situation beyond what has been related here.
Thus, I take issue with the majority conclusion that "the medical evidence that [plaintiff's difficulty] was heart-related or angina was undisputed when plaintiff was discharged from the hospital on December 4." It was not until shortly before trial in their testimonial depositions that the two physicians involved conclusively related the plaintiff's heart trouble to his initial complaints.
If the opinions which the doctors expressed in their testimonial depositions were presented to the insurer previous to that time, there is nothing in the record to indicate that. Interestingly, the plaintiff/appellant did not assign the failure of the trial court to award penalties and attorney's fees as part of his single specification of error. Also, he did not list it as one of his four issues or include it in his syllabus.
The question of when angina/heart attacks legally present a compensable situation is a difficult area of law. See Guidry v. Sline Industrial Painters Inc., 418 So. 2d 626 (La.1982) and Hibbard v. M-N Utilities, Inc., 530 So.2d 1190 (La.App. 2d Cir. 1988). When coupled with a cloudy factual situation such as occurred in the instant case, the problem is even more difficult.
I suggest that Duplechain v. Gulf States Utility Co., 468 So.2d 1386 (La.App. 3d Cir.1985) or Washington v. Southern Baptist Hospital, 506 So.2d 144 (La.App. 4th Cir.1987), cited by the majority, do not lend assistance to the result reached. In Duplechain, the employer had the reports of two doctors relating the plaintiff's bursitis to his occupation as a welder yet refused to accept these reports or to seek further medical information. In Washington virtually no investigation occurred even though the defendant had considerable notice of the accident.
Also, I am at a loss to understand the solace the majority finds in Adams v. New Orleans Public Service, 418 So.2d 485 (La. 1982) and Guidry, supra in stating that these two cases "clearly set standards for evaluating and analyzing claims of employees with pre-existing heart disease who experience angina, without a heart attack, while working." Adams is perhaps the benchmark heart attack/angina case in which a sharply divided court determined that plaintiff's angina caused by his long-standing arteriosclerosis was job-related. Penalties and attorney's fees were not an issue.
Guidry was somewhat different from Adams. The Guidry plaintiff suffered a heart attack during a short work break. The main thrust of the case was whether an on-the-job heart attack as the result of arteriosclerosis was caused by the employment. The court determined that Guidry's work that day, which included bracing a ladder and moving it as required for other painters constituted exertion or strain "greater than would be involved in every day non-employment life." Thus, a prima facie showing was made "that the accident arose out of or was connected with, the employment." Guidry, supra at 633.
The issue of penalties and attorney's fees in Guidry was abruptly decided against the plaintiff because of "the serious legal question of causation between employment and accident" as well as the "facts of the case, and the varying results in the trial court, Court of Appeal and this Court." Guidry, supra at 635.
In conclusion, I suggest that the majority jurisprudence does little to lend support to the result there reached, and on balance, argues against penalties and attorney's fees in the instant case. Further, I am concerned that the majority opinion may create an expanded duty to investigate *1131 and/or may reduce a plaintiff's current burden of proof on the issue of penalties and attorney's fees.