508 So.2d 197 (1987)
Ronald C. TALLEY, Jr., Plaintiff-Appellee,
v.
ENSERCH CORPORATION, et al., Defendants-Appellants.
No. 86-504.
Court of Appeal of Louisiana, Third Circuit.
May 13, 1987.
Rehearing Denied June 10, 1987.
*199 Denis Paul Juge, New Orleans, for defendants-appellants.
Gaharan and Wilson, Joseph Wilson, Jena, for plaintiff-appellee.
Percy and Assoc., H. Gregory Walker, Jr., James B. Reichman, of Gist, Methvin, Hughes & Munsterman, Alexandria, for defendant-appellee.
Before STOKER, LABORDE and YELVERTON, JJ.
YELVERTON, Judge.
This is an appeal from a suit for worker's compensation benefits and medical expenses incurred as the result of a heart attack suffered by plaintiff. The accident happened after the 1983 amendments to the Louisiana Worker's Compensation Act and is therefore governed by those amendments. The plaintiff prevailed in the trial court and the defendants appeal several findings of the trial court. We affirm in part, amend in part, and reverse in part.
The trial court has set forth its reasons for judgment in a well-written opinion and we will adopt portions of that opinion.
Plaintiff's employment and the circumstances of the heart attack were explained by the trial judge as follows:
"In July of 1983, the Plaintiff, RONALD C. TALLEY, JR. (hereinafter sometimes referred to as TALLEY) suffered a myocardial infarction. At the time of the incident TALLEY was employed by a subsidiary of ENSERCH CORPORATION (hereinafter sometimes referred to as ENSERCH), who has been made Defendant herein. The disability arising from this health difficulty has given rise to this Worker's Compensation suit.
"TALLEY originally became employed as a salesman for DJ OILFIELD RENTAL TOOLS in 1979. Sometime during 1982 DJ OILFIELD RENTAL TOOLS was acquired by ENSERCH and operated as a subsidiary of its ASSOCIATED OIL TOOLS, INC. division. Made Defendants in this particular law suit are ENSERCH CORPORATION, ASSOCIATED OIL TOOLS, INC., and EMPLOYERS' NATIONAL INSURANCE COMPANY (the worker's compensation insurer).
"In November of 1982 ENSERCH transferred TALLEY to its Oklahoma City, Oklahoma, office as divisional manager. This particular office was basically a new operation. TALLEY, as general manager, was in charge of hiring and firing, sales, setting up and maintaining office facilities, and other managerial duties. Additionally, because of the nature of the business, and because of the newness of the operation, he was obligated to perform various physical tasks.
"The first myocardial infarction occurred on Tuesday, July 12, 1983 in Oklahoma City. On Friday before the attack, it was necessary for TALLEY and a single warehouseman to fill an order of drill pipe by physically loading the pipe themselves for transportation to the job site. This particular incident was an all night affair.
"On the day of the initial attack Dick Farrell, an officer of the company had made a regularly scheduled visit to the Oklahoma City office. Farrell and TALLEY discussed business through part of the afternoon at the company's office and then left to meet a Travis Vaught for a round of golf. Vaught was a representative of another company who did business with the defendant company, but more importantly, was responsible for introducing TALLEY to potential customers and contacts within the Oklahoma City area.
"During the golf game, TALLEY began to experience pain indicative of a heart attack. He was taken to an Oklahoma City hospital where he was diagnosed as having suffered an acute myocardial infarction.
*200 "TALLEY remained in the Oklahoma City hospital until July 24, 1983, at which time he returned to Jena, Louisiana. The return to Jena was necessitated by the fact that, although the operation of the company was in Oklahoma City, he still maintained his family home in Louisiana. He had not yet moved his family to Oklahoma City and had spent the time from transfer to Oklahoma City up until the day of the attack commuting back and forth on a regular basis to be with his family.
"Approximately two days after his return he suffered a second attack and was admitted to the LaSalle General Hospital under the care of Dr. Robert Kendrick. On July 28, 1983, TALLEY was transferred to the St. Frances Cabrini Hospital in Alexandria, Louisiana. After further tests were conducted there, it was recommended that TALLEY undergo coronary by-pass surgery. This surgery occurred on August 3, 1983, at which time four coronary artery by-pass grafts were effected. On August 10, 1983, TALLEY was discharged, but never has returned to employment.
"A claim for worker's compensation benefits was instituted in January of 1984, but the company denied benefits. Suit was filed on May 16, 1984 for weekly benefits, medical expenses, penalties, attorney fees, interests and all costs. The defendants denied that a compensable accident occurred and alleged in the alternative, that they should receive credit for $1800 per month payments, and $40,000 in hospital and medical benefits paid, pursuant to an employee benefit program.
"The first issue to be determined is whether or not TALLEY was in the course and scope of his employment at the time of the heart attack and whether or not the attack arose out of his employment. Although TALLEY was engaged in a golf game at the time of the incident, it is clear that this was part of his duties. The evidence establishes that entertainment of business customers and acquaintances was a part of his job duties. It was, and is, an acceptable means of doing business within the industry. The testimony of Farrell and TALLEY was to the effect that the golf game had both a social and business purpose. It is significant to note that the company paid all the expenses associated with the golf activities, including payment of dues, green fees, golf balls and similar equipment requirements. The employer, if not expressly, did impliedly require the participation of TALLEY in the recreational activity and gained substantial benefit therefrom. Defendant cites Larson's Treatise on Workmen's Compensation which clearly fits this particular set of circumstances. The jurisprudence of this State is to the effect that whether or not a work related accident occurs is a question to be decided by the trial court. See Deville v. Port Pipe Terminal of Louisiana, Inc., 419 So.2d 16 (La.App. 3rd Cir.1982), and Roussel v. Colonial Sugars Company, 318 So.2d 37 (La.1975).
"The next question to be determined is whether or not there was a causal connection between the heart attack and the employment such as to satisfy the requirement that the accident arose out of the employment. An accident `arises out of the employment' when it results from a particular risk that the employee is subjected to in the course of his employment and that he would not be subjected to had he not been employed. Additionally, a heart attack may be a compensable accident within the meaning of the Louisiana Workmen's Compensation Statutes. See Shatoska v. International Grain Transfer, Inc., 430 So.2d 1255 (La.App. 1st Cir.1983) and Guidry v. Sline Industrial Painters, Inc., 418 So.2d 626 (La.1982).
"In this particular case, the evidence indicates that the working circumstances in Oklahoma City were extremely stressful. This was a new area of development during a period of general decline in the oil and gas industry and there were numerous problems associated with the operation and maintenance of the company. At the time of the first heart attack, the office personnel consisted of TALLEY, two field salesmen, and a warehouseman. TALLEY was separated from his family and was extremely limited in his visitation time with his family.
*201 "Both Plaintiff and Defendant cite various elements of the medical to the Court in support of their position. Plaintiff argues that the medical testimony clearly indicates a causal connection and Defendant argues the contrary.
"Numerous doctors testified in this matter by deposition. They are as follows:
1. Dr. Robert Thomas Kendrick, a general practitioner residing in LaSalle Parish, Louisiana.
2. Dr. Brian Cole, a specialist in the field of internal medicine and cardiology of Alexandria, Louisiana.
3. Dr. James Driscoll Knoepp, an expert in the field of general thoracic and cardiovascular surgery, of Alexandria, Louisiana.
4. Dr. P.K. Kaimal, an expert in the field of internal medicine and cardiology.
5. Dr. Paul D. Ware, an expert in the field of psychiatry of Shreveport, Louisiana.
In brief Plaintiff cites the testimony of Dr. Ware at pages 10 and 11 of his deposition; the testimony of Dr. Cole at pages 22 and 23 of his deposition; and the testimony of Dr. Kaimal at pages 25 and 26 of his deposition. The Defendant cites to the Court the testimony of Dr. Kaimal at page 22 and 23 of his deposition.
"Guidry v. Sline Industrial Painters, Inc., 418 So.2d 626 (La.1982) clearly indicates that there does not exist a presumption that a vascular accident which might occur on the job is therefore caused by the employment. The Court must find a causal link between the employment and the accident. This must be established by a preponderance of the evidence as should any other element of the plaintiff's case. Alcide Guidry was a fifty-three year old industrial painter who suffered an acute myocardial infarction secondary to atherosclerotic heart disease during a smoke break while at work. The Supreme Court found that Guidry's myocardial infarction occurred on the job and was causally related in some measure to the physical stress, strain or exertion of the job. The Court conducted an historical review of the jurisprudence in the area of work related heart attacks and, recognizing the difficulty associated with disproving or proving causation, the Court made the following statement:
`... Nonetheless, considering the often divergent and uncertain views of medical practitioners and the necessarily different perspectives of doctors and lawyers on this problem in compensation cases, we have decided in prior cases that work related stress or exertion preceding a heart attack bears a causal relationship to that heart attack, at least in part, even where there is a pre-existing heart disease.
.....
`This burden of plaintiff's is to show by a preponderance of the evidence that the work effort, stress or strain in reasonable probability contributed in some degree to the heart accident. Anything less and it can hardly be said that the accident arose out of the employment or that the employment in any measure contributed to the accident.
`If the physical exertion, stress, or strain on the job, and preceding the infarction, is no more than the worker would likely have experienced in a non-work situation, the attack may be the result of the natural progression of the pre-existing disease rather than the result of the employment activity.'

Id. at page 632-633
"In this case, the evidence is to the effect that the work effort, stress and strain in reasonable probability was the cause of the heart attack. The exertion, stress and strain of this particular job was much greater than that which might be experienced in a non-work situation.
"It is the Court's finding that the medical testimony establishes by a preponderance of the evidence that the heart attack suffered by TALLEY was one which arose out of his employment."
Our examination of the record causes us to agree with the trial court that plaintiff was in fact an employee of Enserch Corporation, and that the heart attack suffered was an injury by accident *202 arising out of and in the course of his employment. La.R.S. 23:1031.
Enserch next questions the finding that plaintiff was totally and permanently disabled within the meaning of the 1983 amendments to the Louisiana Worker's Compensation Act. The trial court found:
"... TALLEY has not returned to his job or any other employment since the accident of July 12, 1983. He is a male in his late forties who, by education, is a high school graduate with some college. He had previously worked for approximately ten years as Vice-President for administration in the installment division of Security Pacific National Bank and for three years in public relations for Stuart Title Insurance Company. Additionally, he had previously worked for Palomar Mortgage Company in Monroe, Louisiana, for Associates Finance Company, and for Delta Airlines.
"Dr. Kaimal [a cardiologist] would restrict the Plaintiff from lifting any weight heavier than thirty pounds and would consider this to be a permanent restriction. Dr. Knoepp [a cardiovascular surgeon] agreed with this restriction imposed by Dr. Kaimal and further indicated that he felt the Plaintiff should not be stressed to any degree weight wise or energy wise. He would further establish restrictions regarding climbing, jumping, running, stooping, kneeling, crouching, crawling or reaching in that such activity would produce angina pains in an individual such as TALLEY. Knoepp further indicated that the Plaintiff should not be subjected to sudden temperature changes or dirty, dusty, or toxic conditions. He specifically indicated that TALLEY should not return to his previous occupation. The testimony of Dr. Ware [a psychiatrist] relative to the depression suffered by Mr. TALLEY, combined with the testimony of the other physicians concerning his physical abilities establishes by a preponderance of the evidence that TALLEY is currently unfit for any form of employment...."
We are unable to agree with the trial court's assessment of the extent of disability. LSA-R.S. 23:1221(2)(c) provides that compensation for permanent total disability shall be awarded only if the employee proves by clear and convincing evidence that he is physically unable to engage in any employment or self-employment. Price v. Fireman's Fund Insurance Company, 502 So.2d 1078 (La.1987) (Supreme Court of Louisiana, No. 86-C-1833, February 23, 1987); Captain v. Sonnier Timber Company, 503 So.2d 689 (La.App. 3rd Cir. 1987) (No. 86-284, March 4, 1987). As can be seen from his quoted reasons, the trial court applied the preponderance of the evidence standard, and not the more stringent standard of clear and convincing evidence required under the new statute, for proof of permanent total disability. We find from a review of the medical testimony that the proof was not clear and convincing that plaintiff suffered a permanent total disability. Of the doctors who testified (five in number), four testified that plaintiff could return to his former job but with certain restrictions, notably inability to lift in excess of 30 pounds. No doctor said that he could not do some other employment or self-employment. Only Dr. Ware, a psychiatrist who saw plaintiff one time, testified that he did not think plaintiff could return to any kind of gainful employment in his present condition. We do not regard the sum total of this testimony as clear and convincing as to total permanent disability.
On the other hand, it is clear that temporary total disability does not require the same level of proof; a simple preponderance will do. Drs. Kaimal and Cole thought that as of May 1, 1984, plaintiff was able to handle some kind of job. Dr. Ware saw plaintiff on July 1, 1985, and began treating him. He testified by deposition in September 1985 that plaintiff should be substantially recovered and able to do some kind of work six months after he began his treatment on July 1. Accordingly, we find that the plaintiff has proved temporary total disability through the year 1985. Therefore, we find that the plaintiff is entitled to judgment for temporary total *203 benefits at the maximum rate from July 12, 1983, through December 31, 1985.
Under the Workmen's Compensation Law once a claimant's temporary total disability ceases, he may be entitled to additional benefits under LSA-R.S. 23:1221(3) if he continues to remain partially disabled. See R.S. 23:1221(3)(d)(i).
The testimony suggests that after December 31, 1985, plaintiff would continue to suffer some partial disability. He is therefore entitled to additional relief from that date under LSA-R.S. 23:1221(3), supplemental earnings benefits (SEB). LSA-R.S. 23:1221(3) at the time of plaintiff's accident read in pertinent part as follows:
"(3) Supplemental earnings benefits.
"(a) For injury resulting in the employee's inability to earn wages equal to ninety per cent or more of wages at time of injury, supplemental earnings benefits equal to seventy-four percent of the difference between ninety percent of the average monthly wages at time of injury and average monthly wages earned or average monthly wages the employee is able to earn in any month thereafter in any employment or self-employment, whether or not the same or a similar occupation as that in which the employee was customarily engaged when injured and whether or not an occupation for which the employee at the time of the injury was particularly fitted by reason of education, training, and experience, such comparison to be made on a monthly basis. Average monthly wages shall be computed as four and three-tenths times the wages as defined in R.S. 23:1021(10).
"(b) For purposes of Subparagraph (3)(a), of this Paragraph, the amount determined to be the wages the employee is able to earn in any month shall in no case be less than the sums actually received by the employee, including, but not limited to, earnings from odd-lot employment, sheltered employment, and employment while working in any pain."
"(c)(i) Notwithstanding the provisions of Subparagraph (b) of this Paragraph, for purposes of Subparagraph (a) of this Paragraph, if the employee is not engaged in any employment or self-employment, as described in Subparagraph (b) of this Paragraph, or is earning wages less than the employee is able to earn, the amount determined to be the wages the employee is able to earn in any month shall in no case be less than the sum the employee would have earned in any employment or self-employment, as described in Subparagraph (b) of this Paragraph, which he was physically able to perform, and (1) which he was offered or tendered by the employer or any other employer, or (2) which is proven available to the employee in the employee's or employer's community or reasonable geographic region.
"(ii) For purposes of Subsubparagraph (i) of this Subparagraph, if the employee establishes by clear and convincing evidence, unaided by any presumption of disability, that solely as a consequence of substantial pain, the employee can not perform employment offered, tendered, or otherwise proven to be available to him, the employee shall be deemed incapable of performing such employment.
"(d) The right to supplemental earnings benefits pursuant to this Paragraph shall in no event exceed a maximum of five hundred twenty weeks, but shall terminate:
"(i) As of the end of any two-year period commencing after termination of temporary total disability, unless during such two-year period supplemental earnings benefits have been payable during at least thirteen consecutive weeks; or
"(ii) After receipt of a maximum of five hundred twenty weeks of benefits, provided that for any week during which the employee is paid any compensation under this Paragraph, the employer shall be entitled to a reduction of one full week of compensation against the maximum number of weeks for which compensation is payable under this Paragraph; however, for any week during which the employee is paid no supplemental earnings *204 benefits, the employer shall not be entitled to a reduction against the maximum number of weeks payable under this Paragraph; or
"(iii) When the employee retires or begins to receive old age insurance benefits under Title II of the Social Security Act, whichever comes first; however, the period during which supplemental earnings benefits may be payable shall not be less than one hundred four weeks."
The preponderance of the evidence reveals that plaintiff will be restricted in such activities as climbing, jumping, running, stooping, kneeling and reaching. These actions increase claimant's venous pressure and tend to exert a greater strain on the heart. Claimant will also be limited in the amount of weight he lifts, carries, pushes or pulls to less than 30 pounds. These restrictions result in a partial disability of a permanent nature.
The record further establishes plaintiff's monthly pay was $3,000. He was not employed between December 31, 1985 (when his temporary total disability ceased) and the date of trial, so his earnings during that interval were zero. Applying the formula under R.S. 23:1221(3) plaintiff is entitled to the maximum weekly compensation of $230 per week, as long as he is not earning a wage or able to earn a wage. Since there is no evidence in the record to establish the duration of plaintiff's partial disability, claimant will be entitled to benefits during his disability not to exceed the maximum period allowed under R.S. 23:1221(3). See Breaux v. Ralph Crais Oil Corp., 485 So.2d 575 (La.App. 5th Cir.1986).
The next issue has to do with whether the trial court properly denied a credit for medical expenses and disability payments paid by an employee benefit trust created by the employer. The trial court held that such benefits were effectively part of the remuneration paid to all of the defendant's employees, and that no credit was allowable. Said the court:
"The next question to be determined is whether or not the Defendant is entitled to a credit for disability benefits and medical expenses paid by ENSERCH CORPORATION EMPLOYEE BENEFIT TRUST. From the time of the accident through the date of trial, ENSERCH CORPORATION EMPLOYEE BENEFIT TRUST, a trust organized under the laws of the State of Texas paid medical expenses in the amount of $40,838.79 and benefits at the rate of $1,800.00 per month.
"A representative of the trust, JoAnn Buckman testified that the trust is a separate and distinct entity created under the laws of the State of Texas and that the benefits received thereunder are those which are `earned' by the beneficiary. It constitutes a partial remuneration for services rendered to the company.
"Plaintiff claims that the `collateral source rule' long recognized by Louisiana jurisprudence precludes credit for these payments by Defendants. This rule simply provides that a defendant may not claim credit for payments made through insurance or other collateral sources independent of the Defendants' procuration. (See Corley v. West, 346 So.2d 1272 (La.App. 3rd Cir.1977). This Rule is regularly applied to the Worker's Compensation claims. See Patterson v. City of Baton Rouge, 309 So.2d 306 (La.1975) and Bryant v. New Orleans Public Service, Inc., 414 So.2d 322 (La.1982). Defendant argues that the amendments to the Worker's Compensation Act of 1983, and particularly the changes in Louisiana Revised Statute 23:1225(c)(1) provides for such an offset. That section reads as follows:
`If an employee receives remuneration from: (a) benefits under the Louisiana worker's compensation law, (b) old-age insurance benefits received under Title II of the Social Security Act to the extent not funded by the employee, (c) benefits under disability benefit plans in the proportion funded by an employer, and (d) any other worker's compensation benefits, then compensation benefits under this Chapter shall be reduced, unless there is an agreement to *205 the contrary between the employee and the employer liable for payment of the worker's compenstation benefit, so that the aggregate remuneration from (a) through (d) of this Subsection shall not exceed sixty-six and two-thirds percent of the average weekly wages of the employee at the time of the injury.
...'
"Plaintiff cites Louisiana Revised Statute 23:1163 as its argument for the application of the collateral source rule in this particular case. That section reads as follows:
`It shall be unlawful for any employer, or his agent or representative, to collect from any of his employees directly or indirectly either by way of deduction from the employee's wages, salary, compensation, or otherwise, any amount whatever, or to demand, request, or accept any amount from any employees, either for the purpose of paying the premium in whole or in part on any liability or compensation insurance of any kind whatever on behalf of any employee or to reimburse such employer in whole or in part for any premium on any insurance against any liability whatever to any employee or for the purpose of the employer carrying any such insurance for the employers own account, or to demand or request of any employee to make any payment or contribution for any such purpose to any other person.
`Nothing herein shall be construed to prevent any employer from carrying his own insurance towards his own employees; nothing herein shall apply to an employer qualified under the laws of this State to engage in the liability insurance business.
..."
"The distinction seems to be in this case that the trust benefits constitute remuneration as opposed to mere disability benefit plans envisioned by Louisiana Revised Statute 23:1225. The Court agrees with Plaintiff's argument that to allow the employer to claim credit for the payments in such a situation would effectively require TALLEY to pay his own compensation benefits by virtue of his own earned remuneration. The Court therefore finds that the Defendants may not claim credit for payments through ENSERCH CORPORATION EMPLOYEE BENEFIT TRUST."
The evidence concerning the benefits under the trust fund consisted of the testimony of Ms. Joanne Buckman, a representative of the trust and Mr. Richard Farrell, Vice President of Operations. Ms. Buckman testified that she was unable to answer whether or not the benefits were part of compensation or remuneration earned by the employee. However, Mr. Farrell in his deposition was clear that the benefits did constitute part of the compensation an employee earns by working for Enserch. He also stated that upon hiring new employees, these employees are advised of the trust program. Under these facts we find no error in the trial court's reasoning and conclusions with regard to the above issue.
Enserch is also seeking a credit under R.S. 23:1206 for $6,000 of "unearned wages" the plaintiff received after his accident.
R.S. 23:1206 states as follows:
"§ 1206. Voluntary payments; deductions from benefits
"Any voluntary payment or unearned wages paid by the employer or insurer either in money or otherwise, to the employee or dependent, and accepted by the employee, which were not due and payable when made, may be deducted from the payments to be made as compensation."
In the present case the evidence clearly showed that Talley received two months full pay after his accident and 60 percent of his pay for four months thereafter. However, the evidence also revealed that these benefits were paid to plaintiff under the company's short term disability program and were not wages. No evidence was presented to show that these benefits were unearned wages or compensation "which were not due and payable when made." See R.S. 23:1206. Under these *206 circumstances defendant has failed to establish it is entitled to a credit for these benefits under R.S. 23:1206. See generally Young v. Western Electric Co., Inc., 486 So.2d 962 (La.App. 1st Cir.1986).
Finally, defendant appeals the award of attorney's fees and penalties. We quote the trial court's conclusions:
"Concerning the issue of penalties and attorney fees, the Court finds a very limited investigation by the Defendants. The initial investigation by Millard Goutierrez, claims representative for the insurer, was nothing more than the taking of statements of TALLEY, Farrell, and Vaught. Upon receiving this information Goutierrez recommended that the claim be denied. Even after the matter became involved in the claim process, no additional investigation was accomplished by the insurer or its representative and, from start to finish, the sole reason for contesting the worker's compensation claim was that of the initial investigation.
"This entire matter is one involving a legal evaluation of a set of circumstances. There has never been any witnesses to controvert any evidence offered by TALLEY and the factual situation is not in dispute. However, the insurer, from the initial recommendation to reject the claim through the administrative remedies under the Worker's Compensation Administration, never sought advice of counsel to establish the legal issues involved herein. It is clear to this Court that an employer or his insurer has an affirmative duty to investigate a claim for compensation benefits and a cursory examination thereof is not sufficient. See Naquin v. Texaco, Inc., 423 So.2d 31 (La.App. 1st Cir.1982)."
The defendant has never paid any compensation benefits or medical expenses. The determination of whether an employer is arbitrary and capricious in the refusal to pay benefits is a mixed question of law and fact, and the trial court's determination of the facts is entitled to great weight by a reviewing court. McMiller v. New Orleans Public Service, Inc., 367 So.2d 1354 (La.App. 4th Cir. 1979); Gallien v. Supreme Contractors, Inc., 448 So.2d 871 (La.App. 3rd Cir.1984). We find no error in the trial court's resolution of this issue.
For the reasons assigned, the judgment awarding plaintiff benefits based on total and permanent disability is reversed and set aside; judgment is amended and rendered ordering defendants to pay weekly benefits to the plaintiff at the maximum rate based on temporary total disability from July 12, 1983, through the year 1985, and supplemental earnings benefits from January 1, 1986, until plaintiff's partial disability ceases, not to exceed the maximum period provided by R.S. 23:1221(3); in all other respects the judgment of the trial court is affirmed. Costs of this appeal will be shared equally by plaintiff and defendant.
REVERSED IN PART; AMENDED IN PART; AFFIRMED IN PART; and RENDERED.

ON MOTION FOR REHEARING
PER CURIAM.
Enserch's motion for rehearing complains that the judgment for penalties and attorney's fees rendered against it was erroneous because it had a worker's compensation insurer. It argues that the petition alleged this and that its answer and the answer of Employers National Insurance Company admitted the relationship. This argument is raised by Enserch for the first time in this application for rehearing.
We have re-examined the record and we find no merit to these contentions. Although Employers National Insurance Company was named in the pleadings, it was never alleged or admitted to be the worker's compensation insurer of Enserch. Further, the testimony of Millard Gutierrez, claims manager for Enserch, declares that Employers National had issued a policy of worker's compensation insurance to Enserch but that:
"There's a special agreement between Employer's and Enserch in that we handle all compensation claims; we set reserves; *207 we issue the checks. We have just about complete control over it. There's a letter of credit that is set up and whatever payments are made each month Employer's simply draws on the letter of credit from Enserch, so in effect it's for all intents and purposes a self-insured program."
Based on this testimony the trial court evidently made a factual finding that Enserch was self-insured. There is no manifest error in this determination. The application for rehearing is denied.