559 So.2d 970 (1990)
Norselles HOLMES, Plaintiff-Appellee,
v.
INTERNATIONAL PAPER COMPANY and Kemper Insurance Company, Defendant-Appellant.
No. 21355-CA.
Court of Appeal of Louisiana, Second Circuit.
April 4, 1990.
Rehearing Denied May 3, 1990.
*972 Crawford & Anzelmo by Donald J. Anzelmo, Monroe, for defendant-appellant, Intern. Paper Co.
Sadye Kern Bernheim, Monroe, for plaintiff-appellee, Norselles Holmes.
Before HALL, MARVIN and NORRIS, JJ.
MARVIN, Judge.
From a judgment awarding worker's compensation benefits, the self-insured employer, International Paper appeals, contending that the total and permanent disability of the claimant resulted from a chronic condition and was not caused by any work-related injury. IP alternatively contends that it should be given credit under LRS 23:1225(C)(1)(c) for "weekly disability benefits" paid to Holmes under a sickness and accident policy and also complains of the award of penalties and attorney fees.
The primary issue is resolved by the trial court's finding that claimant's version of what he experienced and when is more credible than IP's hypothesis. We find no clear error and affirm.

FACTS
Holmes was employed in June 1970 by IP, where he worked until 1983, when he *973 began experiencing problems with his right knee and low back and was placed on disability leave. Dr. Louis Gavioli, an orthopedist, then surgically removed benign bone tumors from Holmes' right knee. The knee was thereafter scarred and arthritic. Occasionally through 1988 Holmes' knee would swell and become painful. Dr. Gavioli's lumbar myelogram in 1983 showed some protrusion of the L5-S1 disc. After Holmes returned to work in 1986, this disc ruptured in 1988, allegedly as a result of the February 6, 1988, work-related accident, and was surgically removed by Dr. Gavioli.
While Holmes continued on disability leave in 1985 because of the condition of his knee, Dr. Gavioli's further tests for a ruptured disc were inconclusive. He noted in 1985 that Holmes' back problems were not causing him any significant pain. Dr. Gavioli then assigned Holmes a 10 percent permanent physical disability rating to the body as a whole. Holmes was not allowed to return to work in 1985 because of physical restrictions Dr. Gavioli placed on him.
Dr. Gavioli conducted a return-to-work physical on Holmes in February 1986. Holmes was not then having any back or leg problems and had only occasional knee pain and swelling. Finding Holmes' condition had "definitely improved," Dr. Gavioli reported to IP that he had released him to return to work without restriction.
Holmes was also examined by other doctors in 1986, including Dr. Burt, an orthopedist, and Dr. Gulick, a neurologist. Both released him to return to work with restrictions. Both also noted a history of an "abnormal myelogram" and recurrent knee swelling in their respective reports to IP. Dr. Burt restricted Holmes from activities that required repeated bending or lifting over 50-60 pounds.

THE ACCIDENT
IP allowed Holmes to return to work in May 1986. Twenty-one months later, on February 6, 1988, the alleged accident occurred. Two days before, on February 4, 1988, Holmes had seen Dr. Gavioli, complaining of both knee and low back pain that radiated down his right leg and occasionally into his foot. Dr. Gavioli said he was not able to medically determine which problemback or knee, where he found arthritis, scarring and swellingwas causing his symptoms. Holmes declined Dr. Gavioli's suggestion of further diagnostic testing of the back and was prescribed anti-inflammatory and pain medication for the knee.
On Saturday, February 6, 1988, Holmes and a co-worker, Tommy Davis, were replacing an empty wrapper roller on their machine. Holmes said that as he lifted one end of the 174-pound shaft, he suddenly felt a "tingling" or pull in his lower back and a sharp pain through his right side into his right leg, which rather quickly subsided.
Initially thinking he had a muscle pull, Holmes did not mention to Davis or immediately report to his supervisor what he had experienced. He and Davis completed the task of replacing the roller on the shaft about 30 minutes before his shift ended.
After work that night, Holmes experienced greater pain. He had difficulty walking after getting out of bed the next day, but nevertheless punctually reported to work. After working several hours with increasing pain, he told Davis during a break, and shortly thereafter informed his supervisor, James Lay, that he had hurt his back the previous day while lifting the roller shaft.
Holmes did not immediately report to First Aid as Lay, responding to the report, had instructed, but returned to his duties. He "stuck it out" and then reported to First Aid when his shift ended, he says, because of the shortage of relief workers.
Heat treatments on that Sunday evening, February 7, did not provide relief. The company nurse referred Holmes to Dr. Cox, who prescribed muscle relaxers, pain medication and rest. Holmes' condition did not improve.
On February 10, Dr. Cox referred Holmes to Dr. Gavioli. Dr. Gavioli immediately hospitalized Holmes for diagnostic tests and thereafter recommended surgery *974 for a ruptured disc. Holmes agreed, but was discharged by the hospital after IP's w.c. benefits coordinator informed the hospital that Holmes' injury was not work-related.
After attempting to resolve with IP the coverage issue with his union's assistance, Holmes asked the sickness and accident insurer to pay for Dr. Gavioli's surgery. That insurer agreed. Dr. Gavioli performed a diskectomy and laminectomy at L5-S1 on March 31, 1988.
Following surgery and being disabled, Holmes filed his w.c. claim with the OWC. The OWC recommendation was rejected by IP. Holmes then instituted this action on June 28, 1988.
Holmes was questioned about Dr. Gavioli's 1983 treatments. He said Dr. Gavioli discovered several bone spurs on his right knee and a "couple of weak discs" in his low back. He stated that his 1983 back problem subsided as Dr. Gavioli said it would. Holmes stated that he returned to work in May 1986, after a three-year disability leave, and was not then aware and was not told of any lifting restrictions. He continually worked in 1986-88 in the Finishing and Shipping Department of IP doing heavy lifting as he was doing on February 6, 1988.
Holmes said that the "primary purpose" of his visit to Dr. Gavioli on February 4 (Holmes' day off) was because of knee pain and swelling. His knee problems had become so severe that he wanted to either find the cause or "just get something for the pain." He did not deny discussing back pain with Dr. Gavioli on February 4, 1988.
Mrs. Holmes said that she was aware that her husband had seen Dr. Gavioli on February 4, 1988, for his knee problem, but said her husband did not complain to her of back pain until after the February 6 accident.
Holmes said that before he lifted the shaft he was having no problems, his back felt "pretty good," and that he was able to mow his yard and do house- and church-related physical work. He says he cannot do these things after the lifting incident.
Holmes also explained his reasons for not immediately reporting his injury to either Lay or to First Aid. He said that he and Davis were busy, with paper coming "pretty fast" from two machines, and were trying to replace an empty roller on the machine so they would not get too far behind. He also acknowledged that company policy requires that injuries be reported to his immediate supervisor (Lay). He said that Lay had already gone home and had been replaced by the on-coming foreman, who was on duty but unavailable. Holmes worked the remaining ½ hour of his shift after the lifting incident and sought rest at home.
On the Sunday following, Holmes was not required to do any heavy lifting because they were "running the small stuff, which was coming down pretty fast and he couldn't get anyone to relieve him" so that he could go to First Aid as Mr. Lay had instructed him to do when he reported the Saturday accident.
Davis, who was Holmes' co-worker for over 12 years, was aware that Holmes was making a w.c. claim as a result of his alleged February 6 accident. He remembered lifting the empty paper shaft with Holmes that day. Davis testified he did not see any "looks of pain or discomfort" on Holmes' face or hear any complaints from Holmes.
Davis did not recall Holmes making any physical complaint to him during their 12-year association, and could not recall whether Holmes "acted like" he was having back trouble the following day, commenting that he "didn't notice" and "hadn't paid attention," and that he and Holmes rarely spoke because work was "always hectic."
Lay, the supervisor, testified that he initially learned of Holmes' back injury on Sunday, February 7, when Holmes stopped him near the wrapper machine late that morning and told him he did not think he could make it through the day because he hurt his back on Saturday. Lay stated that Holmes had then been working about five hours and he had seen Holmes 2-3 times that day. Lay stated that he did not notice *975 anything out of the ordinary when Holmes first approached him on Sunday.
Lay asked Holmes why he had not reported the accident on Saturday as IP required. Lay said that Holmes explained to him that he did not think he had hurt his back that badly and that Lay had already left work when Holmes was injured. Lay said that when he advised Holmes to report to First Aid, Holmes replied he would do so when his shift ended.
Without Holmes' knowledge, Lay thereafter observed Holmes working for 20 minutes. Lay said that Holmes appeared to be working at his normal pace and did not appear to be experiencing pain, but admitted that during his observation, it was not necessary for Holmes to lift anything heavy.

MEDICAL EVIDENCE
IP did not call Dr. Cox to testify or introduce his medical reports. Dr. Gavioli's deposition testimony is the only expert opinion evidence in the record.
On February 10, 1988, Dr. Gavioli noted that Holmes was complaining of "considerably more severe" and continuous low back pain radiating into both legs, which was "aggravated by activity" and "not relieved by rest." Holmes was immediately hospitalized by Dr. Gavioli.
A CT-scan and lumbar myelogram showed a midline L5-S1 protruding, and possibly ruptured, disc, which Dr. Gavioli initially treated conservatively without success. On March 31, 1988, Dr. Gavioli surgically found and removed the ruptured disc that was pressuring the nerve at the L5-S1 interspace.
Dr. Gavioli's post-operative examinations reported continued pain, spasm, and weakness, restricted motion and intermittent numbness in the low back. He opined that Holmes was totally and permanently disabled because of chronic low back and leg pain, limited motion and because of recently discovered diabetes. He said that even with suitable training, Holmes would not be able to re-enter the work force in a sedentary job, because sitting would aggravate Holmes' problems.
Dr. Gavioli agreed that Holmes had some pre-existing disc problem and that even without the lifting incident, Holmes might have later required disc surgery. Although Dr. Gavioli could not squarely state when rupture of the disc occurred, he stated that the ruptured disc and Holmes' complaints were consistent with, and could have been caused by, the lifting incident Holmes described and that it was "certainly conceivable" that the lifting incident could have aggravated Holmes' pre-existing spinal condition.

THE EMPLOYER'S CONTENTIONS
IP does not contest that Holmes is totally and permanently disabled, but contends that Holmes failed to prove that his disability was "causally related" to his employment.
Citing Holmes' history of back problems, IP argues that Holmes had a non-work-related disabling condition before February 6. IP notes that Dr. Gavioli had treated Holmes for back problems since 1983, when he found a protruding disc at the L5-S1 level and that he had recommended disc surgery in 1985, which Holmes declined.
IP emphasizes that on February 4, 1988, only two days before the alleged accident, Holmes was treated by Dr. Gavioli for symptomspain in low back radiating down the right legidentical to the symptoms arising from the alleged accident. Dr. Gavioli attributed the February 4 symptoms to a pinched nerve, but admitted that the complaints could have indicated a ruptured disc.
IP further emphasizes that Holmes' failure to immediately report his alleged accident was a violation of company policy. IP also notes that Holmes worked about five hours Sunday before reporting the accident to Lay and ignored Lay's directions to report to the company nurse and continued working under Lay's observation for about 20 minutes without indicating pain, stiffness or other discomfort.
*976 IP argues that these circumstances show that Holmes did not sustain a work-related injury, emphasizing that Holmes did not call fellow employees or witnesses, other than his wife. IP argues her testimony is suspect because she did not know Holmes had seen Dr. Gavioli for his back problems only two days before the alleged accident.
It was the trial court's prerogative to believe Holmes.

LAW
We apply the law in effect on February 6, 1988. Foster v. Manville Forest Products, Inc., 554 So.2d 736 (La.App.2d Cir.1989). A pre-existing condition does not bar a claimant's recovery. Guillory v. U.S. Fidelity & Guaranty Ins. Co., 420 So.2d 119, 122 (La.1982). A claimant must, however, establish the aggravation of the pre-existing condition by a preponderance of the evidence. Hammond v. Fidelity & Casualty Co. of N.Y., 419 So.2d 829 (La. 1982).
The totality of the evidence, medical and lay, determines the cause of disability. In evaluating the evidence, the trier of fact should accept as true the uncontradicted testimony of a witness, even though the witness is a party, at least in the absence of circumstances in the record casting suspicion on the reliability of the testimony. Holiday v. Borden Chemical, 508 So.2d 1381 (La.1987); West v. Bayou Vista Manor, Inc., 371 So.2d 1146 (La.1979).
Testimony of a claimant alone may be sufficient to establish the occurrence of an accident, if there is nothing to discredit him and his statements are supported by surrounding circumstances. Prim v. City of Shreveport, 297 So.2d 421 (La. 1974).
We find no clear error in the trial court's conclusion that Holmes suffered a compensable, work-related injury on February 6, 1988. That conclusion is supported by the record.
The fact that Mr. Holmes occasionally suffered since 1983, and two days before the accident complained of, low back pain, establishes his pre-disposition to a ruptured disc. The evidence shows that for 21 months before the February 6 lifting incident, Holmes performed his required duties with a protruding, but not fully ruptured, disc. After the February 6 incident he attempted to work without having to lift anything but could not continue.
Holmes admits that he failed to immediately report the incident on the day it occurred and made no reference to the injury until the following day. The supervisor, Lay, however, generally corroborated Holmes' in-court explanation of why, how, and when Holmes reported to him.
The issue essentially is credibility, the prerogative of the trial court. Simpson v. S.S. Kresge Co., 389 So.2d 65 (La.1980); Owens v. Georgia Pacific Corp., 535 So.2d 990 (La.App.2d Cir.1989); Green v. Jackson Rapid Delivery Service, 506 So.2d 1345 (La.App.2d Cir.1987).
The trial court obviously believed Holmes' version of the accident and his explanations for not sooner reporting it.

CREDIT ISSUE
We also cannot find that the trial court was clearly wrong in denying credit to IP for weekly insurance benefits paid by the sickness and accident insurer to Holmes. IP claimed credit under LRS 23:1206 in the trial court, which was denied. On appeal, IP claims the credit under LRS 23:1225(C)(1)(c).
Although the trial court requested that the parties file post-trial briefs on the credit issue and later denied IP's credit claim under LRS 23:1206, these briefs are not in the record. We cannot determine whether the trial court was asked to consider the credit issue under LRS 23:1225(C)(1)(c).
Characterizing the payments as "disability benefits," IP argues that because Holmes did not testify that he was required to pay any portion of the premium for these benefits and because IP alone provided and paid for benefits without deduction from Holmes' pay, IP should receive a credit or offset for the weekly amounts paid Holmes.
*977 Several courts, addressing the statute in the context of unemployment compensation benefits, have held that LRS 23:1225 is not self-operating and that an employer is not entitled to unilaterally apply the statute. See Lofton v. Louisiana Pacific Corp., 423 So.2d 1255, 1258 (La. App. 3d Cir.1982). The employer must make judicial demand for and receive judicial approval of the claimed credit. Lofton, supra; Necaise v. A.C. Company of South Louisiana, Inc., 499 So.2d 1074 (La.App. 3d Cir.1986); and Jackson v. Maloney Trucking & Storage, Inc., 442 So.2d 849 (La.App. 4th Cir.1983).
The employer must prove its entitlement to credit under the statutory prerequisites by a preponderance of the evidence. In the event credit is judicially authorized, w.c. payments are reduced prospectively and only from the date of the employer's demand. Lofton and Maloney Trucking, cited supra. See also Guillory v. Stone & Webster Engineering, 545 So.2d 605, 607 (La.App.3d Cir.1989).
The purpose of the credit benefits the employer or w.c. carrier by applying the ceiling on the enumerated "coordinated" benefits and by reducing w.c. costs. The w.c. carrier or the employer is not prevented or precluded, even after a judgment awarding benefits becomes final, from judicially demanding the credit. Lofton and Necaise, both cited supra.
On the record before us we cannot determine whether and when IP made judicial demand for credit. IP did not claim credit in its answer. The issue is not raised in the pre-trial order. Moreover, we have no evidence indicating the actual nature of the alleged "disability" payments Holmes received. The only suggestion is Holmes' trial testimony that he was paid $218 in weekly "sickness and accident benefits" by a Metropolitan policy "provided through IP."
IP argues that Holmes' check stubs do not show premium deductions for the Metropolitan benefit. Holmes' stubs show deductions for a benefit trust, a dependent medical, and a sickness and accident policy. We cannot otherwise determine specifically what the deductions are for. IP did not introduce in evidence either the disability plan or Metropolitan policy upon which its credit claim is based. Even should we assume IP paid for the benefit to Holmes, we cannot, on this record, determine whether the benefit was additional compensation for services rendered, or additional wages, or a disability benefit plan envisioned under the statute. See and compare Fontenot v. Schlumberger Well Service, 503 So.2d 1109, 1115-1116 (La.App.3d Cir.1987) (discussing a "Salary Continuation Plan") and Talley v. Enserch Corp., 508 So.2d 197, 204-205 (La.App.3d Cir.1987), writs denied.
Neither the employer's characterization nor the employee's testimony that benefits were received through a plan provided by the employer is sufficient, without more, to meet the employer's burden of proof.
Under these circumstances, we affirm the judgment denying the credit.

STATUTORY PENALTIES AND ATTORNEY'S FEES
IP finally contends that the trial court should not have awarded penalties and attorney's fees because its defense was "valid" and it reasonably and in good faith disputed the claim. We cannot agree.
An assessment of penalties is proper for the nonpayment of compensation benefits unless nonpayment results from conditions over which the insurer or employer had no control or unless the employee's right to such benefits had been "reasonably controverted." LRS 23:1201E. A claimant's right to benefits will be deemed "reasonably controverted" if the factual and medical information of the employer reasonably counters that of the claimant. Green, supra. If the factual issue is substantial, penalties should be denied. Loyd v. IMC Fertilizer, Inc., 557 So.2d 1078 (La.App.2d Cir.1990). Employers, however, must demonstrate that reasonable efforts were made to medically ascertain the worker's exact condition before denying benefits.
*978 Gary Billiard, IP's safety supervisor and w.c. coordinator, made the decision to deny benefits to Holmes. Billiard reviewed Holmes' personnel record compiled over 18 years. He concluded that Holmes had a "herniated" disc at L5-S1 in 1983. He concluded that Holmes' job did not require heavy lifting. IP's safety manual suggests the contrary.
Billiard first spoke to Holmes about one week after the accident, when Holmes telephoned, inquiring about paying for the surgery recommended by Dr. Gavioli. Billiard said he told Holmes the decision had not been made, but suggested he have the surgery, explaining that if IP did not pay for it, Holmes still had his "own personal insurance."
Two weeks later, and after he read reports from the IP nurse, job foreman and industrial relations manager, Billiard denied w.c. "coverage" because he had a "degree of doubt" whether the disability was work-related. Billiard said he was not aware of, and had not seen, Holmes' 1986 medical reports. It is shown that IP's industrial relations department had in fact received the 1986 medical reports that clearly stated Holmes' condition and placed lifting restrictions on him when he returned to work in 1986.
We must conclude that IP failed to assemble and assess factual and medical information about Holmes' physical condition before denying the claim. IP knew of Holmes' pre-existing back problem and should have known of his restrictions. IP returned Holmes to his job in 1986 which required heavy lifting, contrary to medical restrictions. IP's safety manual warns of the possible danger of injury from lifting a 174-pound shaft and requires that two men lift it.
Considering the medical reports to IP when its decision was made, the medical information and lay testimony presented, and the absence of medical evidence supporting IP's denial, we shall affirm the trial court's award of statutory penalties. See and compare Lescuer v. Liberty Mutual Ins. Co., 552 So.2d 521 (La.App.2d Cir. 1989); and Myers v. Stone Container, Inc., 556 So.2d 202 (La.App.2d Cir.1990), (wherein no claim was made under LRS 23:1201E).

Attorney's Fees
A compensation insurer or employer is liable for attorney's fees when it arbitrarily, capriciously or without probable cause, terminates or refuses to pay benefits. LRS 23:1201.2. The determination of whether the denial of compensation benefits is arbitrary, capricious and without probable cause depends primarily upon the facts existing and known to the employer at the time the employer denies benefits. Hughes v. General Motors Guide Lamp Div., 469 So.2d 369 (La.App.2d Cir.1985); Green, supra. The determination is essentially a question of fact. Green, supra. The termination of, or failure to pay, benefits is not arbitrary and capricious when it is based upon substantial bona fide factual contentions. Crawford v. Al Smith Plumbing & Heating Service, Inc., 352 So.2d 669 (La.1977); Harrison v. Chicago Mill & Lumber Co., 446 So.2d 843 (La. App.2d Cir.1984).
The insurer or employer is required to make every reasonable effort to ascertain the employee's exact medical and physical condition before benefits are denied. Woolsey v. Cotton Bros. Bakery Co., Inc., 535 So.2d 1119 (La.App.2d Cir. 1988); Duplechain v. Gulf States Utility Co., 468 So.2d 1386 (La.App.3d Cir.1985). Being penal in nature, the statute must be strictly construed. Hanks v. CRC Holston, Inc., 430 So.2d 1340 (La.App.3d Cir. 1983); Berkel v. Aetna Casualty & Surety Co., 462 So.2d 1287 (La.App. 5th Cir.1985). An award of attorney's fees is precluded when the employer asserts a good faith defense.
Holmes stated that after his February 6, 1988, injury, he discussed Dr. Gavioli's recommendation with Billiard's assistant, who initially indicated to Holmes that w.c. would cover the expense. A day or so later, Billiard returned and informed the hospital that Holmes' injury was not work-related. The surgery was delayed and Dr. Gavioli discharged Holmes from the hospital. Holmes finally settled the medical expense issue with the sickness and accident insurer. Holmes testified that he had not *979 been paid w.c. benefits or medical expenses.
As in the penalty instance, and considering what IP knew or should have known about Holmes' condition after he returned to work in 1986, we find no error in the award of attorney fees. In short, IP should have known that Holmes was susceptible to rupturing the L5-S1 disc by heavy lifting when he returned to his job in 1986. We also note that Holmes testified that IP advised him to apply for unemployment compensation benefits, ("available for work"), after IP conceded he was disabled. See LRS 23:1600(3); 1601(3)(a), and (7)(b).

DECREE
The judgment, at the employer's cost, is AFFIRMED.

ON APPLICATION FOR REHEARING
Before HALL, MARVIN, NORRIS, FRED W. JONES and LINDSAY, JJ.
Rehearing denied.