682 So.2d 831 (1996)
Willie Mae TAYLOR, Plaintiff-Appellee,
v.
Dr. H.F.M. GARRETT, Defendant-Appellant.
No. 28729-CA.
Court of Appeal of Louisiana, Second Circuit.
October 30, 1996.
*833 Patricia Barfield, Shreveport, for Defendant-Appellant.
C. Daniel Street, Monroe, for Plaintiff-Appellee.
Before MARVIN, BROWN and GASKINS, JJ.
MARVIN, Chief Judge.
In this workers' compensation action, Morehouse Medical Center and Louisiana Workers' Compensation Corporation appeal the WCHO's awards of temporary total disability, permanent partial disability and supplemental earnings benefits, vocational rehabilitation services, penalties and attorney fees to Willie Mae Taylor, who injured herself in the course and scope of her employment when she burned her hand attempting to extinguish a flaming pot of potpourri wax.
We affirm all awards other than for 25 "additional" weeks of permanent partial disability benefits, which were the subject of a later workers compensation action related to Ms. Taylor's disfigurement.

FACTS
Taylor was a full time employee of Morehouse Medical Center, Dr. H.F. Garrett's "clinic." She also worked one day a week at the home of Dr. and Mrs. Garrett. In addition to general cleaning and housekeeping, Taylor's duties at the clinic included taking patients' blood pressure and temperatures, performing some tests such as urinalysis dip stick, assisting with pap smears, helping patients, setting up instrument trays for medical procedures and handling supplies. On Wednesdays, at Dr. Garrett's home, she cleaned, cooked and attended to laundry. At both jobs, she was paid by the hour and usually earned some overtime pay. She was paid each week by a check written on the clinic's account. The amount of her wages and benefits are not disputed.
On December 8, 1993, while cleaning Dr. Garret's home, Taylor attempted to extinguish a flaming pot of potpourri wax burning on the stove. She sustained second and third degree burns to her right hand. The burns were to the palm of the hand, the volar base of the fingers and to the radial side of the thumb on the dorsum of the thumb. The litigants agree that Taylor's accident was in the course and scope of her employment.
After initially treating her, Dr. Garret referred Taylor to a plastic surgeon, Dr. Timothy Mickel. Dr. Mickel found a severe skin injury, but no injury to the motor nerves. Sensory nerve damage, however, caused or contributed to the pain Taylor suffered.
On January 11, 1994, Dr. Mickel performed surgery, executing a debridement of the wound and applying a split thickness skin graft to the back of Taylor's hand, the donor site for the graft being on the back of her thigh. There were no complications and Dr. Mickel noted a 100 percent take of the graft on January 17, 1994.
On January 30, 1994, Dr. Mickel suggested that Taylor begin vigorously and aggressively moving her hand to avoid stiffness, instructing her to squeeze a sponge 200 times a day.
On February 25, 1994, due to concerns that Taylor was not adequately moving her hand and fear of increased stiffness, Dr. Mickel scheduled physical therapy. On March 4, 1994, he noted that Taylor's hand was very stiff and it was evident that she could not squeeze the sponge as directed.
Taylor's range of motion in her hand did not increase as Dr. Mickel thought it should. Other parts of her hand, affected by lack of use, atrophied and stiffened. While the stiffened joints were not near the burned area of her hand and were an "unusual consequence," Dr. Mickel opined that Taylor's stiff joints and pain were directly related problems, both being an indirect effect of the injury.
The skin graft on Taylor's hand thickened around the edges because of exuberant scar tissue or fibrous tissue, which made the graft stiff. Dr. Mickel became concerned about Taylor's slow progress.
On March 11, 1994, after a week of formal physical therapy, Taylor's range of motion improved but she still had significant stiffness in both the large and small joints of *834 her hand. On March 18, 1994, Taylor's hand remained very stiff. Dr. Mickel recommended more or "particularly aggressive" physical therapy, hoping that Taylor could "make up some lost ground" and get her function back to normal.
Dr. Mickel felt on March 25, 1994 that Taylor's hand showed some continued improvement. Dr. Mickel found that Taylor still could not completely extend her fingers or flex the joints between her fingers and hand. Taylor continued physical therapy, up to five hours a day at one point, but her progress was "slow."
After the therapist opined that Taylor had achieved as much benefit as she was going to achieve from therapy, Dr. Mickel released Taylor to return to work with no restrictions on June 3, 1994.
On June 2, 1994, Dr. J. Lee Etheredge, a board-certified orthopedic surgeon, examined Taylor. He found residual stiffness in her hand, fingers and thumb, along with weakness in the upper arm due to disuse. However, he felt that Taylor could return to her job as a physician's assistant and "see if she could tolerate this well," stating that she may have to modify her work activity.
On June 6, 1994, based upon the recommendations of Dr. Mickel and Dr. Etheredge, Taylor returned to her job at the clinic. However, she was unable to perform most of her former duties because of pain and swelling in her hand.
Mrs. Garrett, the office manager of the clinic, testified that she sent Taylor home because Taylor complained that she could not perform all of her job duties and was holding her hand and crying in the presence of patients. Dr. Garrett testified that he noticed that Taylor was in a lot of pain after she returned to the clinic. He questioned her release to return to full duty because many of her duties required considerable manual dexterity.
Dr. Garrett told Taylor that she must be able to do all of her previous job duties if she wanted to come back to work for him.
Dr. and Mrs. Garrett corroborated Taylor's testimony about her not being able to do her job. Dr. Garrett affirmed that he told Taylor that she needed to "fill the tasks that she had been fulfilling" or she should "make other arrangements." He also testified that he told Taylor that she should go back to the people who released her to work and tell them that she could not do it. Mrs. Garrett testified that Taylor was not "useful" to the clinic if she could not perform her regular, pre-injury duties. She also confirmed that Taylor complained of pain when she tried to come back to work, testifying that Taylor told her that it felt like ants were stinging her hand.
Taylor was paid temporary total disability benefits from the date of her injury until Dr. Mickel released her to return to work. Her benefits were not reinstated after her unsuccessful attempt to return to work for two days.
On July 1, 1994, Dr. Mickel referred Taylor back for further rehabilitation, wanting a thorough functional assessment comparing her injured hand to her normal hand. Dr. Mickel's records do not indicate whether this was undertaken or accomplished.
Dr. Mickel continued to treat Taylor through August of 1994. In July, he noted that the skin graft donor site on her thigh was unusually tender, thick and hypertrophic. Her fingers were still stiff and Dr. Mickel felt that she may have reached a "plateau" in her recovery, noting that she had not achieved full function after lengthy physical therapy. Dr. Mickel recommended that Taylor see a hand specialist to consider the possibility of another surgery to release her stiff joints and perhaps regain some lost range of motion. He also felt that a hand specialist could determine whether Taylor suffered from reflex sympathetic dystrophy ("RSD") and consider prescribing nerve blocks or some other modality in a more supervised setting.
About two weeks after her two-day attempt to return to work, Taylor went to work for the Morehouse Parish Sheriff's Department at the parish jail. Her duties at the jail include doing some paperwork such as filling out prison cards, assisting female inmates, locking and unlocking cell doors and answering the phone. She testified that she is not *835 required to perform any tasks at the jail that she is physically unable to do. When her work causes pain, she is allowed to stop and return to it later. In addition to her job at the jail, Taylor does laundry for a friend one day a week for $25 and cleans her own house and does some gardening.
Because she earned less than 90 percent of her pre-accident wages at her job at the jail, Taylor sought supplemental earnings benefits ("SEBs"). Appellants denied Taylor's claim.
The WCHO held an administrative hearing on May 24, 1995. After hearing and receiving evidence, the WCHO ordered that Taylor be seen by a hand specialist and withheld decision until submission of the specialist's findings. Three specialists, Dr. Ferral Endsley, Dr. John Knight and Dr. Joe Morgan, thereafter submitted their findings to the WCHO.
Dr. Endsley examined Taylor on June 23, 1995. He considered it doubtful that any additional improvement would be obtained in her fingers, while recommending continued symptomatic treatment but no further therapy. He opined that Taylor should be happy that her hand is at least partially functional and not overly sensitive. He also determined that she did not develop some type of RSD.
Dr. Morgan saw Taylor on July 10, 1995. He found that Taylor had a permanent partial disability of 56 percent of the right hand, which rating would not change, considering she had reached maximum medical improvement. He opined that she would have most of her problems in trying to use her hand for fine gripping and holding of objects and that she would have less endurance for activities.
Dr. Knight saw Taylor on July 17, 1995. His impression was flexor tendon adhesions with PIP flexion contractures. He recommended either living with the problem or undergoing a tenolysis and contracture release that had an approximate 80 percent success rate.
On October 27, 1995, the WCHO rendered a decision in favor of Taylor, awarding her temporary total disability benefits ("TTDs") from the date of her injury until she started work at the jail. The WCHO noted that appellants had already paid Taylor 75 weeks of permanent partial disability benefits ("PPDs") but awarded an additional 25 weeks. Following the payment of PPDs, Taylor was awarded supplemental earnings benefits ("SEBs") based on an average weekly wage of $297.33. The WCHO also ordered that Taylor be allowed to continue treatment with Dr. Morgan or Dr. Knight and recognized her entitlement to any recommended vocational rehabilitation services. Lastly, the WCHO found appellants arbitrary and capricious and assessed a penalty of $2,000 and awarded attorney fees of $5,000.
Appellants complain of all awards except the order to provide continued medical treatment.

STANDARD OF REVIEW
We review the findings of fact by a WCHO under the "manifest error" standard. Doucet v. Baker Hughes Production Tools, 93-3087 (La.3/11/94), 635 So.2d 166. The issue is not whether the WCHO was right or wrong, but whether the factual conclusion was reasonable. Stobart v. State, Through DOTD, 617 So.2d 880 (La.1993); Stevens v. Wal-Mart Stores, Inc., 27,977 (La.App.2d Cir. 11/1/95), 663 So.2d 543. Mere conflicts in evidence will not suffice to overturn a hearing officer's reasonable evaluations of credibility and reasonable findings of fact. Rosell v. ESCO, 549 So.2d 840 (La.1989); Stevens, supra. Thus, where there are two permissible views of the evidence, the fact finder's choice between them cannot be manifestly erroneous or clearly wrong. Stobart, supra.

DISCUSSION
Entitlement to Weekly Benefits
Appellants contend that the WCHO manifestly erred in awarding Taylor TTDs from the date of her injury until she began work at the jail and in awarding her SEBs thereafter. In support of their argument, appellants rely upon Dr. Mickel's and Dr. Etheredge's releases of Taylor to return to work. Appellants also contend that Taylor is not entitled to SEBs because she could perform *836 her former job at the clinic just as well as her present job at the jail.
La. R.S. 23:1221(1)(c) entitles an injured employee who is not engaged in any employment or self-employment to compensation for temporary total disability if the employee proves by clear and convincing evidence that she is physically unable to engage in any employment or self-employment notwithstanding the location or availability of such employment. Mayeux v. Kentucky Fried Chicken, 28,163 (La.App.2d Cir. 4/3/96), 671 So.2d 1261, writ denied.
An employee is entitled to SEBs if she is earning or able to earn less than 90 percent of her pre-injury wage. § 1221(3)(a); Mayeux, supra. Once it has been established that the employee's work-related injury has rendered her unable to earn 90% of her pre-injury wages, the employer must show that the employee is physically capable of work and that work was offered or available within a reasonable geographic region. If the employer does so, the employee must then show that she is unable to perform employment offered or available solely as a consequence of substantial pain. See Adams v. City of Shreveport, 27,284 (La.App.2d Cir. 8/23/95), 660 So.2d 127, writ not considered, and cases cited therein.
The issue of disability within the framework of the workers' compensation law is not solely a medical determination. Manson v. City of Shreveport, 577 So.2d 1167 (La.App. 2d Cir.1991), writ denied. The totality of the evidence, lay and medical, resolves the issue. Crawford v. Al Smith Plumbing & Heating Service, Inc., 352 So.2d 669 (La.1977); Jackson v. Georgia Casualty and Surety Company, 513 So.2d 530 (La. App. 2d Cir.1987), writ denied. The fact finder is free to accept or reject expert opinion. Harris v. Bronco Constr. Co., 93,2139 (La.App. 1st Cir. 10/7/94), 644 So.2d 805, writ denied.
Both Dr. and Mrs. Garrett corroborated Taylor's testimony that she was required to perform all of her pre-injury duties in order to return to work at the clinic. Otherwise, Taylor would not be "useful" to the clinic.
The medical evidence also corroborated that Taylor continually experiences persisting problems with her hand, with a permanent partial disability of 56 percent, a disability that will not improve. She will continue to have difficulties with gripping and holding objects and she will have less endurance for activities.
Appellants rely on Dr. Mickel's and Dr. Etheredge's releases of Taylor to return to work, emphasizing that Dr. Mickel's deposition testimony indicated that he did not change his position regarding Taylor's work status. Although Dr. Mickel released Taylor to return to work in June 1994, he continued to treat her through August 1994, as well as referring her to others. Similarly, Dr. Etheredge's release of Taylor to return to work was not unconditional. Dr. Etheredge released/Taylor to return to her work as a physician's assistant to "see if she could tolerate this well." He also noted that she "may have to modify her work activity a little."
The WCHO held that there was an abundance of evidence indicating that Taylor was unable to perform her pre-injury duties, stating:
The Garretts attempted to indicate they were willing to allow claimant to work back into her job duties gradually, but their testimony was contradicted by the testimony of claimant and this court does not find their testimony to be credible. The evidence is clear that claimant was a hard working and trustworthy employee who had devoted many years to working for the Garretts. There is no foundation for this court to believe that claimant did not want to return to work for the Garretts.
We cannot find that the WCHO was clearly wrong in weighing the evidence and making credibility determinations. Accordingly, we affirm the WCHO's decision awarding Taylor temporary total disability and supplemental earnings benefits.

Vocational Rehabilitation
Appellants assign as error the WCHO's order to provide Taylor additional vocational rehabilitation services as recommended. Appellants *837 argue in this regard, just as they did regarding Taylor's entitlement to SEBs, that she is capable of earning her pre-injury wages and, thus, not entitled to vocational rehabilitation.
La. R.S. 23:1226(A) entitles an employee to vocational rehabilitation when she has suffered an injury in the course and scope of her employment which precludes her from earning wages equal to her pre-injury wages.
The WCHO found that Taylor was incapable of earning at least 90 percent of her preinjury wages. As aforesaid in our discussion of SEBs, we find no manifest error. The record supports the conclusion that Taylor is entitled to vocational rehabilitation.

Permanent Partial Disability Benefits
The WCHO recognized that Taylor's claim for permanent disfigurement was resolved by the payment of 75 weeks of permanent partial disability benefits ("PPDs"), but awarded Taylor an "additional" 25 weeks of PPDs. As we find that permanent disfigurement was not among the issues presented for determination by the WCHO in this matter, we reverse that portion of the WCHO's award.
The litigants and the WCHO stated the issues to be litigated at the hearing:
(1) accident within course and scope;
(2) nature and extent of disability;
(3) entitlement to weekly benefits;
(4) penalties and attorney fees; and
(5) entitlement to rehabilitation services.
When Taylor attempted to introduce evidence of disfigurement at the hearing, the WCHO, after defense counsel's objection, recognized that the issue was not then before her and advised Taylor to make it the subject of another action.
After the hearing, Taylor asserted a separate claim under a separate docket number for disfigurement, as the WCHO recommended. That claim was resolved by agreement, with appellants paying 75 weeks of PPDs to Taylor. Thereafter, that claim was dismissed with prejudice on August 10, 1995, before the WCHO's decision in this appeal. On October 27, 1995, the WCHO rendered her decision in this matter.
The 25 "additional" weeks of PPDs should not have been awarded because that issue was not presented in this matter but was the subject of a separate claim, which was resolved by the parties and then dismissed with prejudice. We shall reverse that portion of the WCHO's decision.

Penalties and Attorney Fees
La. R.S. 23:1201 subjects the employer or insurer to statutory penalties for any unpaid compensation or medical benefits, unless the employer or insurer reasonably controverts the employee's claim. A claim is reasonably controverted if the employer or the insurer had sufficient factual and medical information to reasonably counter the factual and medical information presented by the employee. Woolsey v. Cotton Bros. Bakery Co., Inc., 535 So.2d 1119 (La.App. 2d Cir. 1988), writ denied. Under § 23:1201.2, the employee is entitled to attorney fees if the failure to pay benefits is found to be arbitrary, capricious, or without probable cause. An award of attorney fees is precluded when the employer asserts a good faith defense. Holmes v. Int'l Paper Co., 559 So.2d 970 (La.App. 2d Cir.1990). The determination of whether an employer should be cast with penalties and attorney fees is a question of fact for the hearing officer, whose findings shall not be disturbed on appeal absent manifest error. Bradley v. Justiss Oil Co., Inc., 618 So.2d 646 (La.App. 2d Cir.1993); McKenzie v. City of Bossier City, 585 So.2d 1229 (La.App. 2d Cir.1991).
Appellants terminated Taylor's benefits and denied her claim for SEBs because they received releases for her to return to work from Dr. Etheredge and Dr. Mickel, her treating physician. Appellants argue that Dr. Mickel never changed his opinion regarding Taylor's work status. Appellants knew, however, that Taylor continually experienced problems with her hand and received treatment long after they terminated her benefits. After receiving medical evidence corroborating Taylor's complaints after her attempt to return to work, appellants continued to deny benefits. Under these circumstances, we find no manifest error in the assessment of penalties and the award of attorney fees.

*838 DECREE
The WCHO's awards of temporary total disability and supplemental earnings benefits, vocational rehabilitation services, penalties and attorney fees are affirmed. The award of permanent partial disability benefits is reversed. Costs of the appeal are assessed one-half to appellee and one-half to appellants.
AFFIRMED IN PART; REVERSED IN PART.