|, WILLIAMS, J.
The claimant, Michael Hawthorne (“Hawthorne”), filed a disputed claim for compensation in the Office of Workers’ Compensation (“OWC”),[1] seeking supplemental earnings benefits (“SEBs”), medical benefits, penalties and attorney fees from his statutory employer, General Motors Corporation (“GM”) and its compensation insurer, Zurich American Insurance Company (“Zurich”).[2] GM and Zurich denied that the claimant was entitled to benefits and asserted that he had committed fraud to obtain benefits. The OWC awarded the claimant limited temporary total disability (“TTD”) benefits and medical benefits, but rejected his claims for SEBs and penalties and attorney fees. The claimant now appeals, seeking an increase in benefits as well as an award of SEBs, penalties and attorney fees. GM and Zurich have answered the appeal, arguing that the OWC erred in awarding TTD benefits and in failing to order the claimant’s benefits forfeited under LSA-R.S. 23:1208. For the following reasons, we affirm in part, reverse in part and remand.
FACTS
Hawthorne was employed by Acco as a labor foreman at the GM construction site in Shreveport. Near the end of the workday on November 26, 2001, Hawthorne testified that he loaded a golf cart with several steel beam sections for disposal at the lay down yard. He testified that he did notLdrop off the beam sections, but he responded to a radio call to unload a supply truck at the Acco trailer. He testified that when he arrived at the trailer, the truck had been unloaded, so he sat in the golf cart and talked to the material suppliers. Hawthorne further testified that as he was sitting in the golf cart, another supplier’s truck backed into the bumper of the cart and pushed the cart forward. Hawthorne testified that during the crash, one of the steel beams on the cart struck him on his side. According to Hawthorne, a fellow employee took him to the GM safety trailer, where he reported the accident and complained of a burning pain in his neck. He stated that he was given a cold pack and was instructed to return to the safety trailer the next day. He later returned to work.
Hawthorne testified that on the next day, November 27, 2001, he returned to work and complained to Gilbane’s safety director that he had pain in his neck and left lower back. He further testified that the pain worsened throughout the day, so he went to the emergency room at Willis- *1207 Knighton Hospital in Shreveport. He stated that the medical personnel took X-rays and prescribed medications. According to the Willis-Knighton medical records, X-rays of Hawthorne’s neck and back showed mild degenerative changes but no acute abnormalities. Hawthorne was diagnosed with acute neck and back strain.
According to Hawthorne, he reported to work on November 28, 2001, and his employer immediately sent him' to see Dr. Douglas Holman at Christus Schumpert Hospital in Shreveport. Hawthorne testified that he complained to Dr. Holman about his neck and back pain. The hospital’s 13medical records indicate that X-rays of Hawthorne’s spine revealed no acute abnormalities. The records also indicate that Dr. Holman diagnosed Hawthorne with back and neck pain, instructed him to continue with two of his current medications and restricted him to light-duty work.
Hawthorne testified that he continued to work at GM. He stated that he “fire-watched,” or observed when welders were working, and that he was able to do this job either standing up or sitting down. He further stated that he worked forty-hour weeks at the same hourly pay that he received prior to the accident, when he was working seventy- or eighty-hour weeks.
According to the Christus Schumpert Hospital’s medical records, over the next few weeks, Hawthorne returned to see Dr. Holman several times with continued complaints of back pain. The records indicate that in December 2001, Hawthorne sustained a subsequent unrelated groin injury while he was at work. The records also indicate that in December 2001, Dr. Holman ordered an MRI of Hawthorne’s back and noted that the MRI showed no striking abnormalities, except a slight bulging disc. Because Dr. Holman found that Hawthorne’s pain continued despite conservative treatment, Dr. Holman transferred Hawthorne’s care to Dr. Robert Holladay, IV, an orthopedic surgeon.
Dr. Holladay testified that he first saw Hawthorne on January 10, 2002. He testified that Hawthorne did not disclose any prior back injuries, and his chief complaint was low back pain. He testified that during his first visit, Hawthorne completed a “Pain Disability Index” that asked him to describe the effect of his pain on his activities. On a scale of one to ten, Rwith ten being “totally disabled,” Hawthorne indicated that his pain totally disabled him from family/home responsibilities, recreation, social activities, work and sexual activities. He rated his disability as a nine for self-care (taking a shower, driving and getting dressed) and as an eight for life-support activities (basic life support behaviors such as eating, sleeping and breathing). Dr. Holladay testified that Hawthorne also completed a “Short-Form McGill Pain Questionnaire” whereon he indicated that his pain was “severe,” the worst category, for each of the fifteen descriptions of pain provided. Dr. Holladay explained that “usually when those are marked in that degree, it is felt by the people that developed that test that the person who filled out the questionnaire is emotionally responding to his pain in an exaggerated manner.” Finally, Hawthorne completed an “Oswestry Function Test” whereon he indicated' the following answers: his painkillers gave him complete relief from pain; he could not lift or carry anything at all; pain did not prevent him from walking any distance; pain prevented him from sitting at all; pain prevented him from standing more than ten minutes and pain prevented him from traveling except to the doctor or hospital.
Dr. Holladay testified that he conducted a physical examination of Hawthorne, noting that he had some lower back tender *1208 ness, a mild limp on the left, back and hip pain and no radiating leg pain. Dr. Holla-day reviewed the MRI performed on January 4, 2002 and found no evidence of a herniating disc or a narrowing of the spinal canal. He noted that the MRI report indicated “minimal disc bulging” in one area, but he disagreed with that finding and concluded that the radiology report did not have any | ñclinical significance. After reviewing the pain questionnaires and conducting the physical examination, Dr. Holladay diagnosed Hawthorne with low back pain, with mild symptom magnification. He opined that Hawthorne could continue his modified work activities as well as his heat and exercise therapy. He further opined that surgery was not warranted and that Hawthorne would fully recover.
Dr. Holladay testified that when he saw Hawthorne for his second visit on February 7, 2002, Hawthorne was using a cane. The doctor noted that Hawthorne had restricted movements in bending and extending and still had a slight limp. Dr. Holla-day stated that Hawthorne “was using his cane primarily for balance” because it did not appear that he was bearing any weight on the cane or using it often. The doctor maintained his previous diagnosis and treatment recommendations. Dr. Holla-day also testified that after this visit, he was provided a surveillance videotape of Hawthorne, and he noted that Hawthorne was performing activities that were inconsistent with his complaints of pain.[3]
Dr. Holladay testified that on Hawthorne’s last visit on March 7, 2002, Hawthorne still had complaints of low back pain, but indicated that the therapy had helped him. The doctor testified as follows:
[Mr. Hawthorne] could get up from a chair, he could get to the examination table, had a minimal limp. His straight leg raising | ^tests were negative in both sitting and lying positions. Examining the knees there were no complaints. There were no complaints in his ankles or feet. His reflexes were equal at the knees and at the ankles and in the normal range. It was noted that while we were talking about his knees and his ankles that he would actually lean over and touch his knee or below his knee down to the lower leg, and really did not cause any complaints of pain. [I] [c]ouldn’t find any evidence of any atrophy or shrunken muscles in his lower extremities.
Dr. Holladay testified that in a bending test, Hawthorne’s effort was inconsistent with how he had earlier performed in the examination. He further testified that Hawthorne subjectively indicated that he had pain during the entire time that he tested him.
Dr. Holladay stated that his nurse reported to him that Hawthorne was able to walk across the waiting room without a limp or a cane, but “when he started coming to the exam room, then he suddenly developed a limp [and] started using his cane.” Dr. Holladay also testified that he observed Hawthorne leaving the building: “Looking out of the window, he walked out to a vehicle to pick him up without using his cane; he did not have the exaggerated *1209 limp that he had when he was in the office.” Based upon these observations, the doctor opined that Hawthorne was engaging in symptom magnification — a charge that Hawthorne flatly denied.
Dr. Holladay opined that by March 18, 2002, Hawthorne was capable of resuming his regular full-duty work and released Hawthorne to full-work activities without limitations, restrictions or any recommendations for additional therapy. He further opined that Hawthorne was not a candidate for surgical treatment or additional diagnostic testing. Dr. Holladay testified that Hawthorne did not keep his April 2002 appointment 'and that |7he has not seen him since March 2002. GM terminated Hawthorne’s employment on March 24, 2002, when he refused to return to full-duty work. Hawthorne testified that he could not return to full-duty work because of his back and left leg pain and that he has not worked since his termination from GM.
In April 2002, he went to an orthopedic surgeon of his choice, Dr. Pierce Nunley. According to Dr. Nunley, Hawthorne gave a history of the accident and complained of back pain. He testified that Hawthorne indicated that he did not have any previous history of back pain, injury or surgery. Dr. Nunley examined Hawthorne and found “a fairly negative exam,” noting that Hawthorne was able to follow his commands in moving and changing positions. He also conducted a neurological examination and found no “significant deficits” in Hawthorne’s upper or lower extremities. Dr. Nunley opined that Hawthorne had diskogenic pain (low back pain) and pelvic girdle dysfunction. The doctor stated that he ordered a second MRI because the earlier MRI was of fairly poor quality. He also ordered physical therapy.
Dr. Nunley testified that he again saw Hawthorne on May 8, 2002 and informed him that his employer’s insurer did not authorize a second MRI. The doctor stated that he resubmitted the MRI request with a request for an EMG study. According to Dr. Nunley, the purpose of the MRI and EMG study was to further delineate Hawthorne’s diagnosis and to determine if Hawthorne had any significant injuries to his neural structures. According to the second MRI report, there were unremarkable results at Ll-2, L2-3 and |RL3-4; a “mild disc bulge with mild subfacet steno-sis, bilaterally but likely not of clinical significance” for L4-5 and “mild degenerative disc disease with mild retrolisthesis.” This produces some mild subfacet stenosis for L5-S1.
In the meantime, Zurich terminated Hawthorne’s therapy. Dr. Nunley testified that, he next saw Hawthorne on June 28, 2002 and they discussed Zurich’s termination of Hawthorne’s therapy. Dr. Nun-ley stated that the purpose of the therapy was to realign a pelvic imbalance and to strengthen Hawthorne’s back and trunk muscles and these conditions were different from those for which therapy had earlier been provided, so he made a renewed request for therapy. He testified that Hawthorne had the same low back pain complaints and he informed Hawthorne that if he did not improve, he would need disc fusion surgery.
Dr. Nunley stated that the renewed request for therapy was approved. According to his records, a notation dated August 8, 2002 indicates that Hawthorne had not been attending his therapy and he was discharged from therapy after his prescription expired. According to Dr. Nun-ley, he saw Hawthorne again on August 9, 2002 and Hawthorne stated that his pain level was about the same, although the therapy had helped him. Dr. Nunley testified that he recommended a diskography, a diagnostic procedure used to identify disk-related pain, to determine the reason *1210 ableness and appropriateness of the lumbar fusion surgery. Dr. Nunley’s records indicate that after this visit, he received a letter from Zurich, denying payment for any further treatment for Hawthorne.
|9Pr. Nunley testified that on the September 9, 2002 visit, Hawthorne’s complaints of pain were unchanged, and they discussed surgery again. He testified that Hawthorne’s complaints of pain continued unchanged at the next visit on December 12, 2002. Dr. Nunley prescribed additional medications for muscle relaxation, sleep and inflammation. On the February 12, 2003 visit, Hawthorne continued to make the same complaints of pain, so Dr. Nunley referred him to a pain management specialist. Hawthorne continued to attend physical therapy through the spring of 2003 and reported that the therapy helped him; however, he continued to complain of back pain. Dr. Nunley stated that he again recommended a diskography to determine if surgery was warranted. He also stated that Hawthorne’s last visit was on June 4, 2003, and neither Hawthorne’s examination results nor his recommendation had changed. Dr. Nunley opined that Hawthorne’s condition never improved where he could return to medium or heavy work. The insurer did riot approve the request for the diskography.
On January 9, 2002, the claimant filed a disputed claim for workers’ compensation against GM and Zurich. The trial was held on June 19, 2003. On January 20, 2004, the OWC rendered its judgment along with written reasons. The OWC found that the claimant had been injured in a work-related accident on November 25, 2001 and that he was entitled to TTD benefits of $398 per week from November 25, 2001 until March 18, 2002, “at which time he was capable of returning to his previous employment with |inno restrictions.”[4] The OWC denied Hawthorne’s claim for SEBs, but ordered GM/Zurich to pay the medical bills incurred during the TTD period. The OWC denied Hawthorne’s claim for penalties and attorney fees for the employer’s failure to timely pay indemnity and medical benefits, finding that the employer reasonably controverted Hawthorne’s claim. Finally, the OWC found that the claimant did not violate LSA-R.S. 23:1208 and LSA-R.S. 23:1208.1 by willfully making false statements or representations for the purpose of obtaining workers’ compensation benefits. The claimant now appeals this judgment. GM and Zurich have answered the appeal.
DISCUSSION
Standard of Review
In Dean v. Southmark Construction, 2003-1051 (La.7/6/04), 879 So.2d 112, the Supreme Court explained the appellate review of the findings of the OWC:
In workers’ compensation cases, the appropriate standard of review to be applied by the appellate court to the OWC’s findings of fact is the “manifest error-clearly wrong” standard. Accordingly, the findings of the OWC will not be set aside by a reviewing court unless they are found to be clearly wrong in light of the record viewed in its entirety. Where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. The court of appeal may not reverse the findings of the lower court even when convinced that had it been sitting as the trier of fact, it would have *1211 weighed the evidence differently. The determination of whether injury occurred in the course and scope of employment is a mixed question of law and fact.
(Citations omitted).
InAward of Workers’ Compensation Benefits
The claimant contends the OWC erred in awarding him TTD and medical benefits up to March 18, 2002. He argues that the OWC should have awarded him benefits extending through the present day rather than through March 18, 2002. He further argues that the OWC should have given more weight to Dr. Nunley’s testimony as opposed to Dr. Holladay’s testimony. The employer and insurer have filed an answer to the appeal, contending the OWC erred in making the award of compensation benefits because Hawthorne was capable of working during this period.
When the OWC is determining an initial award of TTD benefits, the applicable statute is LSA-R.S. 23:1221(l)(c). Murray v. Hollywood Casino, 38,539 (La.App.2d Cir.6/23/04), 877 So.2d 199. LSA-R.S. 23:1221(1)(c) provides as follows:
For purposes of Subparagraph (l)(a) of this Paragraph, whenever the employee is not engaged in any employment or self-employment as described in Subpar-agraph (l)(b) of this Paragraph, compensation for temporary total disability shall be awarded only if the employee proves by clear and convincing evidence, unaided by any presumption of disability, that the employee is physically unable to engage in any employment or self-employment, regardless of the nature or character of the employment or self-employment, including but not limited to any and all odd-lot employment, sheltered employment, or employment while working in any pain, notwithstanding the location or availability of any such employment or self-employment.
Hawthorne had the burden of proving, by clear and convincing evidence, that he was physically incapable of engaging in any employment or self-employment.
|12After a thorough review of this record, we conclude that the OWC was not manifestly erroneous in finding that Hawthorne was entitled to indemnity and medical benefits until March 18, 2002. The OWC was presented with conflicting expert testimony from Drs. Holladay and Nunley. Dr. Holladay testified that there were no objective findings to support Hawthorne’s subjective complaints of pain. Based on his examinations and observations of Hawthorne, as well as his review of the surveillance videotape, Dr. Holladay opined that the claimant could return to full-duty work by March 18, 2002. He also opined that the claimant should have fully recovered from any alleged injury by March 18, 2002, specifically stating that Hawthorne would not need any further medical treatment.
In contrast, Dr. Nunley testified that Hawthorne never improved during the course of treatment (commencing in April 2002) where he could return to medium or heavy work. He further testified that he disagreed with Dr. Holladay’s opinion that a diskography was inappropriate and unnecessary. Dr. Nunley opined that the claimant was a candidate for the procedure because of his complaints and pattern of pain, the MRI findings, the failure of conservative treatment and the passage of time since the accident.
Clearly, the OWC found that Dr. Holla-day’s testimony was more credible and more focused on Hawthorne’s ability to work than Dr. Nunley’s testimony. In light of this record, we find no particular reason why the OWC should have, as Hawthorne argues, weighed Dr. Nunley’s opinion more heavily than Dr. Holladay’s *1212 opinion. We find no error in the 11sOWC’s decision to award indemnity and medical benefits through March 18, 2002.
However, as asserted by the employer and insurer in their answer, we find that the OWC was clearly wrong in awarding TTD' benefits to Hawthorne through March 18, 2002. Dr. Holman released Hawthorne to light-duty work almost immediately after the accident. Dr. Holladay continued the light-duty work recommendation through March 18, 2002. Hawthorne testified that he worked full-time on light duty until March 2002.
LSA-R.S. 23:1221(l)(c) specifically states that TTD benefits are available only for an injured worker unable to engage in any employment or self-employment. Hawthorne clearly did not satisfy this burden at trial. Accordingly, the judgment of the OWC is reversed insofar as it awards TTD benefits to the claimant, Michael Hawthorne, and the case is remanded to allow the OWC to make an appropriate award of SEBs.
Penalties and Attorney Fees
The claimant contends the OWC erred in not awarding penalties and attorney fees for the defendants’ failure to timely pay his compensation and medical benefits. He argues that the defendants’ efforts to controvert his claim were unreasonable. The OWC found that although the defendants failed to timely pay benefits, they reasonably controverted the claim.
The penalty provision in effect at the time of the alleged denial of benefits controls. Gay v. Georgia Pacific Corporation, 32,653 (La.App.2d Cir.12/22/99), 754 So.2d 1101. Former LSA-R.S. 23:1201(F) provided, in part:
Failure to provide payment in accordance with this Section shall result in the assessment of a penalty in an amount equal to twelve percent of any unpaid compensation or medical benefits or fifty dollars per calendar day, whichever is greater, for each day in which any and all compensation or medical benefits remain unpaid, together with reasonable attorney fees for each disputed claim; however, the fifty dollars per calendar day penalty shall not exceed a maximum of two thousand dollars in the aggregate for any claim....
[[Image here]]
(2) This Subsection shall not apply if the claim is reasonably controverted or if such nonpayment results from conditions over which the employer or insurer had no control.
Penalties are stricti juris and should be imposed only when the facts clearly negate good faith and just cause in connection with the refusal to pay. Bolton v. Mike Fleming Construction, 36,521 (La.App.2d Cir.12/11/02), 833 So.2d 1177. The determination of whether an employer should be cast with penalties and attorney fees is a question of fact for the OWC, and as such is subject to manifest error review. Taylor v. Garrett, 28,729 (La.App.2d Cir.10/30/96), 682 So.2d 831.
The OWC was not manifestly erroneous in concluding that the employer and its insurer reasonably controverted Hawthorne’s claim. Dr. Holman released Hawthorne to light-duty work immediately after his first examination, and the employer accommodated Hawthorne’s restrictions at work and also provided him with medical treatment by sending him to Drs. Holman and Holladay. In March 2002, Dr. Holladay reported that Hawthorne was engaging in symptom magnification and was ready to return |1fito work with no restrictions. The surveillance videotape from February/March 2002 showed Hawthorne engaging in daily activities without particular difficulty, other than a limp. In the absence of evidence that the employ *1213 er/insurer acted in bad faith, we find that the OWC correctly denied penalties and attorney fees.
Forfeiture of Benefits for Fraud
In their answer to the appeal, GM and Zurich contend the OWC erred in failing to find that the claimant violated LSA-R.S. 23:1208. They argue that the OWC should have ordered Hawthorne’s benefits forfeited because he committed fraud to obtain them. Specifically, they point to Hawthorne’s history of back pain complaints and to his denial of previous back injuries to his doctors and the OWC. The OWC found that the claimant did not violate LSA-R.S. 23:1208 and denied the forfeiture of the claimant’s benefits.
LSA-R.S. 23:1208 provides, in part:
A. It shall be unlawful for any person, for the purpose of obtaining or defeating any benefit or payment under the provisions of this Chapter, either for himself or for any other person, to willfully make a false statement or representation.
[[Image here]]
E. Any employee violating this Section shall, upon determination by workers’ compensation judge, forfeit any right to compensation benefits under this Chapter.
After a thorough review of this record, we conclude that the OWC was not manifestly erroneous in finding that the claimant did not violate LSA-R.S. 23:1208. Drs. Holladay and Nunley testified that Hawthorne did not disclose his complaints of back pain prior to the accident. Dr. Holladay observed an inconsistency between the claimant’s complaints of pain and|1fihis physical capabilities in and out of the examinations. During cross examination, Hawthorne repeatedly testified that he did not recall several occasions where he complained of back pain. He denied that he did not have any prior lower back pain; however, he admitted to a previous “light pain” in his upper back that went away. Hawthorne’s medical records indicate several complaints of back pain before 2001. His medical records further indicate that as late as 1998, he complained of lower back pain and left leg weakness after he was hit on the head with a crane ball at work.
The OWC found that the claimant did not violate LSA-R.S. 23:1208 by willfully making false statements for the purpose of obtaining workers’ compensation benefits. In making this finding, the OWC had the opportunity to observe the claimant and to judge the credibility of his explanation for his failure to report his previous injuries as well as review the doctors’ testimony and the medical documentation.
On review, an appellate court must be cautious not to re-weigh the evidence or to substitute its own factual findings just because it would have decided the case differently. Bonin v. Ferrellgas, Inc., 2003-3024 (La.7/2/04), 877 So.2d 89. Because the OWC had the opportunity to observe Hawthorne, and found his explanation of the omissions and discrepancies to be credible, we will not disturb that finding on appeal. Consequently, we conclude that the OWC was not clearly wrong in finding that the claimant did not violate LSA-R.S. 23:1208. This assignment of error lacks merit.
|17CONCLUSION
For the foregoing reasons, the judgment of the OWC is affirmed in all respects except for that portion awarding temporary total disability benefits, rather than supplemental earnings benefits, for the period of disability of the claimant, Michael Hawthorne. This case is remanded to the OWC for the entry of the proper award of supplemental earnings benefits. Costs of this appeal are assessed equally to the claimant, Michael Hawthorne, and the de *1214 fendants, General Motors Corporation and Zurich American Insurance Company.
AFFIRMED IN PART; REVERSED IN PART AND REMANDED.

. This case is from the OWC, District 1-West, Shreveport, Louisiana.

. Originally, Gilbane and Acco Systems were named as the claimant's employers. However, Gilbane is the safety coordinator at the GM site, and Acco is the claimant's direct employer. Due to a contractual agreement, GM and its insurer, Zurich, are liable for any workers’ compensation benefits.

. According to Defense Exhibit D-4, a private investigator videotaped Hawthorne outside of his home on February 23, 2002 and March 4, 2002. The videotape shows Hawthorne walking, repeatedly getting into and out of his car and driving. At one point, Hawthorne bends at the waist to lean into his car; at another point, Hawthorne quickly raises his hands above his head. The videotape shows that Hawthorne walks with a moderate, noticeable limp and that he did not use a cane. On cross examination, Dr. Holladay testified that pain medication, such as Hawthorne's, could help a patient decrease his symptoms to the point where the patient could be more physically active.

. The OWC cites November 25, 2001 as the accident date. However, based on the documents in the record., November 26, 2001 appears to be the correct date.